[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
June 6, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-14911
Non-Argument Calendar

_____

BIA Nos.
A95-899-462 & A95-899-463

PEDRO JAVIER RODRIGUEZ MORALES,
ROSA MATILDE GUTIERREZ-CRUZ RODRIGUEZ,
JAVIER EDUARDO RODRIGUEZ,
ANGELA PATRICIA RODRIGUEZ GUTIEREZ,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(June 6, 2007)**

Before TJOFLAT, BIRCH and HULL, Circuit Judges.

PER CURIAM:

Pedro Javier Rodriguez Morales, a citizen of Colombia, petitions for review of the Bureau of Immigration Appeal's (BIA) order, affirming the Immigration Judge's (IJ) order of removal. Because the record supports the conclusion that Rodriguez was threatened for his refusal to provide dental services to guerillas, and not because of his political opinion, the record does not compel reversal of the BIA's finding that Rodriguez failed to demonstrate a nexus between his political opinion and his persecution, as required for asylum relief or withholding of removal. Moreover, because Rodriguez testified that the authorities were helpful in protecting him from the guerillas, the record does not compel a finding that the authorities acquiesced to any alleged torture, as required for CAT relief. Accordingly, we DENY the petition.

## I. BACKGROUND

Rodriguez entered the United States as a non-immigrant visitor, with authorization to remain here for a temporary period not to exceed 26 November 2002.[1]  In July 2002, he applied for asylum and withholding of removal on the basis of persecution for political opinion.  In his application, he stated that the

---

[1]Rodriguez's Notice to Appear alleged that he was admitted to the United States on 26 November 2002, on a temporary visitor visa, for a period not to exceed 26 November 2002. This apparent misnomer was not noted in any of the proceedings below, however, and seems not to have affected the outcome of Rodriguez's case.

FARC,[2] a guerilla group, threatened to kidnap and kill him if he did not "work for them in their hospitals and serve [them] with their medical needs." AR at 206.

He attached a written statement, in which he stated that he was a well-known dentist in the rural municipality of Quetame, where he occasionally provided dental services to the needy. According to his statement, one day, as he was traveling to a medical center, he was approached by two men, who identified themselves as members of the FARC, and asked him to become part of their group and deliver dental services to their members. He told them that he could not be part of any organization that killed people, and quickly left with a group of other doctors. Several months later, he received an anonymous phone call, stating that his brother-in-law had been kidnaped, and he later received a second call, stating that the brother-in-law's body had been found. He speculated that the killing may have had something to do with his confrontation with FARC members.

Rodriguez's statement went on to provide that he later was informed by three police officers of rumors that the FARC was planning an attempt on his life. The police provided him with a truck and police escorts for his protection, to help him relocate his office to an area called Caqueza. However, he received several phone calls while in Caqueza, in which the caller threatened to kill his family if he did not provide dental services to the FARC, but he continued to refuse to

_____

[2] Revolutionary Armed Forces of Colombia.

cooperate. He again relocated his office, this time to Bogata, where he continued to receive threatening phone calls. One day, a man who had been a regular patient stated that he was a member of the FARC, and told Rodriguez to come with him, or Rodriguez would be killed. Rodriguez escaped by saying that he first had to tend to another patient and slipping out of the back door. He reported the incident to the police, but decided not to attend a meeting with the prosecutor, because he feared for his life. Instead, he moved his family out of the country and came to the United States. He stated that, because of these incidents, he and his family had suffered greatly.

At his removal hearing, Rodriguez submitted several exhibits, including: (1) a 2004 State Department Country Report on Colombia ("Country Report"), stating, inter alia, that conflicts perpetrated by guerrilla groups caused between 3,000-4000 deaths in 2004; (2) a psychological report from the Florida Center for Survivors of Torture, stating that, based on Rodriguez's statements regarding his encounters with the FARC, he suffered from post-traumatic stress disorder; and (3) several official reports, stating that Rodriguez had been threatened by the FARC in Colombia. In addition, Rodriguez testified that, in March 1998, three men approached him as he was leaving his office, identifying themselves as members of the FARC, and asked him to join them as a dentist and a link to peasants in the area. He told the men that he would not join them because he did not agree with

4

their political views and their use of violence. A week later, someone called his office, identifying himself as a member of FARC, and, when Rodriguez again declined the offer to work with the FARC, the caller said that Rodriguez soon would receive a call that would change his mind. A few months later, another individual called him and told him that his brother-in-law had been kidnaped, and, a week later, he received another call, in which the caller stated that his brother-in-law had been killed and that Rodriguez was the cause of the murder. About a week later, someone called and told him that "they were not playing around." AR at 129.

In July, three police officers came to Rodriguez's office and warned him that they had reason to believe that the guerillas were planning an attempt on his life, and they recommended that he relocate to another city. Rodriguez went to the mayor's office to report what had happened, and then went to the commander of the police, who provided Rodriguez with a truck and two police officers to assist him in moving his office to a nearby city. Eight months after relocating, he received a phone call from a guerilla, stating that the FARC had located him, there was no use in hiding, and "if [he] was not with them, [he] was against them." AR at 129-30. Again, Rodriguez told the caller that he would not join them, to which the caller replied that they considered Rodriguez their enemy and a military objective. After this, he again relocated his family, this time to Bogota.

A year and a half later, Rodriguez found a piece of paper slipped under his door, on which was written a "prayer for the dead," stating that he soon would die. After this, he moved his family to another part of Bogota. One day, a patient stated that he belonged to the FARC and that several people were waiting for Rodriguez outside. Rodriguez said that he had to attend to another patient and snuck out of a back door, at which point he drove to his home and told his wife to take their family to another city. On the road, he encountered a guerilla roadblock, but the man who came to his car recognized that Rodriguez was a dentist who had helped him in the past, and let Rodriguez leave, after warning him that he was on a list of people to be retained "dead or alive." AR at 133-34. After this, he and his family fled to the United States. Rodriguez testified that he refused to work with the FARC because he disagreed with their political ideals and use of violence, and he feared that he would be killed if he returned to Colombia.

In closing arguments, Rodriguez's counsel argued that Rodriguez had suffered persecution based on an imputed political opinion, because the FARC had interpreted his refusal to work with them as a rejection of their political ideals. The government argued, inter alia, that the record contained evidence that the Colombian authorities attempted to assist Rodriguez, but Rodriguez left before the authorities could take appropriate action.

The IJ denied Rodriguez's application for asylum, withholding of removal, and CAT relief, finding that, although Rodriguez's testimony was credible, he had not shown persecution on account of one of the five grounds recognized as a basis for political asylum. First, the IJ found that Rodriguez had not demonstrated past persecution because, while he testified that he had received threats, neither he nor any member of his immediate family was detained or physically harmed by the FARC. The IJ noted that generally harsh conditions, experienced by many other persons in a country, do not constitute persecution. Second, the IJ found, Rodriguez failed to show that he was threatened or harassed because of his politics, but rather, he was threatened because the FARC wanted to recruit him as a dentist. The IJ found that a guerilla group's attempt to coerce a person into performing a service does not constitute persecution based on a protected ground. Furthermore, the IJ found, Rodriguez had not demonstrated a probability that he would be persecuted based on a protected ground, in order to qualify for withholding of removal, and had not shown that he would be tortured by, or with the acquiescence of, the Colombian government, in order to qualify for CAT relief.

Rodriguez appealed the IJ's decision to the BIA. In his brief, he asserted that he had been persecuted for multiple reasons, both because he refused to provide dental services and because of his political opinion against the FARC, and the IJ erred in requiring that he show that he was persecuted solely on the basis of

7

his political opinion. He argued that, because the FARC wanted to use him to recruit peasants into their political cause, and he rejected their political ideals, the record supported a finding that he was persecuted based on his political beliefs. He also asserted that he was eligible for withholding of removal, and argued that he was eligible for CAT relief because the FARC's tactics constituted psychological torture, and the Colombian government's inaction constituted acquiescence to this torture. Finally, he argued that mental distress can constitute persecution, and the IJ erred in finding that the FARC's threats against him did not constitute persecution.

The BIA dismissed Rodriguez's appeal, affirming the IJ's decision that Rodriguez had failed to establish that the harm that he feared was on account of a protected ground. The BIA found that, while an alien need not show that he was persecuted solely based on his political opinion, he must produce evidence from which it is reasonable to conclude that the harm was motivated, at least in part, by an actual or imputed political opinion. The BIA found that there was no evidence that the FARC persecuted Rodriguez based on his political opinion, but rather, the evidence demonstrated that they wanted him to render dental services to their organization and to help them recruit peasants. The BIA noted that a petitioner must demonstrate that he was persecuted based on his own opinion, and not

8

because of the persecutor's, and therefore, Rodriguez had failed to demonstrate a nexus between his political opinion and his alleged persecution.

The BIA next concluded that, because Rodriguez had failed to demonstrate eligibility for asylum, he also had failed to meet the higher burden required for withholding of removal. Regarding his CAT claim, the BIA found that, because the evidence showed that the Colombian authorities had been "very helpful" in response to Rodriguez's complaints about harassment, he had not shown that the government had acquiesced to any psychological torture perpetrated by the FARC. The BIA declined to reach the question of whether psychological injury constituted torture.

## II. DISCUSSION

On appeal, Rodriguez asserts that he was persecuted for dual reasons, namely, because the FARC wanted to employ his dental services, and because of his political opposition to the FARC, and argues that the BIA erred in finding that he was not persecuted for his political opinion. Moreover, he asserts, the FARC had a "political motive" for persecuting him, in that it wanted him to join the organization and to communicate with the peasants on its behalf. Appellant's Br. at 17. In addition, he notes his testimony that, during a phone call in which he refused to join the FARC, the caller stated that "if [Rodriguez] was not with them he was against them," which showed that his persecution was "wholly political."

Id. He next argues that he was entitled to withholding of removal, asserting that the evidence that he presented, including the Country Report, established that it was "more likely than not" that he would be persecuted upon his return to Colombia. Id. at 20. Finally, he argues that he should have been granted CAT relief, asserting that he suffered psychological torture, and the Colombian government acquiesced to his torture in that they were "passive[ly] complian[t]" with it. Id. at 21-22.

When, as here, the BIA issues its own opinion, we review only the decision of the BIA, except to the extent the BIA expressly adopts the IJ's decision. See Reyes-Sanchez v. U.S. Att'y Gen., 369 F.3d 1239, 1242 (11th Cir. 2004). In reviewing the BIA's finding that an alien has not established persecution on the basis of a protected ground, our review is limited to whether the BIA's decision was "supported by reasonable, substantial, and probative evidence on the record considered as a whole." INS v. Elias-Zacarias, 502 U.S. 478, 481, 112 S.Ct. 812, 815 (1992) (internal quotation and citation omitted). "To reverse the [BIA's] fact findings, [this Court] must find that the record not only supports reversal, but compels it." Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003). Only in a "rare case" does the record compel the conclusion that an alien has suffered past persecution or a well-founded fear of future persecution. Silva v. U.S. Att'y Gen., 448 F.3d 1229, 1239 (11th Cir. 2006).

To establish asylum eligibility based on political opinion, the alien carries the burden to prove, with credible evidence, either that (1) he suffered past persecution on account of his political opinion, or (2) he has a "well-founded fear" that his political opinion will cause him to be persecuted. Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1230-31 (11th Cir. 2005) (per curiam) (citation omitted). "The asylum applicant must establish eligibility for asylum by offering 'credible, direct, and specific evidence in the record.'" Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1287 (11th Cir. 2005). Establishing a history of past persecution creates a rebuttable presumption that the alien has a fear of future persecution. Id. at 1286.

To warrant reversal of the BIA's finding that an alien has failed to demonstrate a sufficient nexus between his political opinion and his alleged persecution, we must be compelled to find that the alien will be persecuted "because of" his political opinion. See Elias-Zacarias, 502 U.S. at 483, 112 S.Ct. at 816 (emphasis in original). The fact that the guerillas' actions are motivated by the guerillas' political belief is "irrelevant" to the question of whether the alien was persecuted on account of the alien's political belief. Id. at 481-82, 112 S.Ct. at 815-16. In Elias-Zacarias, the Supreme Court held that the record did not compel a finding of a nexus between the alleged persecution and the alien's political opinion, where the alien's family had refused to join anti-government guerrilla

11

forces because the "guerillas [were] against the government," and the family feared retaliation from the government. Id. at 479-80, 112 S.Ct. at 814-15.

In the context of a claim for withholding of removal, we have held that "[i]t is not enough to show that [the alien] was or will be persecuted or tortured due to [the alien's] refusal to cooperate with the guerrillas." Sanchez v. U.S. Att'y Gen., 392 F.3d 434, 438 (11th Cir. 2004) (citation omitted). In Sanchez we held that the record did not compel a finding of a nexus between the alien's political opinion and her alleged persecution, even though the FARC threatened the alien for refusal to cooperate with them because she was "not in agreement with the way the FARC had destroyed the country." Id. at 436-38 (alteration omitted); see also Rivera v. U.S. Att'y Gen., No. 06-10209, slip op. (11th Cir. May 23, 2007) (evidence that petitioners were persecuted for failure to pay "war tax" to the FARC did not compel finding that persecution was on account of political opinion).

The record does not compel a finding of a nexus between Rodriguez's alleged persecution and his actual or imputed political opinion. Rodriguez's testified that the FARC sought him out because they wanted him to perform dental services for their members. (See AR at 126-30). While Rodriguez argues that the FARC also wanted him to help in spreading their political views, making the FARC's motives "political," that evidence of the FARC's motive does not constitute evidence that the guerrillas persecuted him "because of" his political

12

opinion. See Elias-Zacarias, 502 U.S. at 481-82, 112 S.Ct. at 815-16. Moreover, Rodriguez's testimony, that the FARC threatened him after he told them that he disagreed with their cause, could support an inference of persecution because of his political beliefs, but the evidence equally supports an inference that he was threatened simply because of his refusal to provide dental services, and the record does not "compel" this Court to hold otherwise. See Sepulveda, 401 F.3d at 1230.

To qualify for withholding of removal or CAT relief, an alien must establish standards more stringent that those for asylum eligibility; thus, an alien unable to prove a "well-founded fear" of persecution based on a protected ground, as required for asylum relief, necessarily fails to demonstrate a "clear probability of persecution," the standard applicable to a claim for withholding of removal." Ruiz v. Gonzales, 479 F.3d 762, 764 (11th Cir. 2007). In addition, to qualify for CAT relief, an alien must demonstrate a likelihood that he will be tortured at the "acquiescence" of the government, meaning that the government was aware of the torture, yet breached its responsibility to intervene. Reyes-Sanchez, 369 F.3d at 1242.

### III. CONCLUSION

Because the record does not compel the conclusion that Rodriguez's has a well-founded fear of persecution on account of a protected ground, the record also does not compel the conclusion that he satisfies the more stringent standard

13

applicable to a claim for withholding of removal. <u>See</u> <u>Zheng v. U.S. Att'y Gen.</u>, 451 F.3d 1287, 1292 (11th Cir. 2006).  Moreover, the record does not compel a reversal of the BIA's finding that the Colombian government did not "acquiesce" to the FARC's activities, in order to qualify him for CAT relief, especially given Rodriguez's testimony that the police provided him with protection and assistance in relocating his business, and investigated his complaints as they arose. <u>See</u> AR at 129-30, 213.  Therefore, we DENY his petition.

**PETITION DENIED.**