[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-10250
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 19, 2008
THOMAS K. KAHN
CLERK

Agency Nos. A97-929-742,
A97-929-743

MAURICE SINVILIEN JOSEPH,
MONIQUE JOSEPH ALEXANDRE,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(December 19, 2008)

Before CARNES, HULL and WILSON, Circuit Judges.

PER CURIAM:

Maurice Sinvilien Joseph and his wife, Monique Joseph Alexandre, citizens of Haiti, petition for review of the Board of Immigration Appeals's ("BIA") order affirming the Immigration Judge's ("IJ") denial of asylum and withholding of removal under the Immigration and Nationality Act ("INA") and the United Nations Convention Against Torture ("CAT"). After review, we deny in part and dismiss in part the petition.

## I. BACKGROUND

On November 25, 2003, Joseph entered the United States as a nonimmigrant visitor. In January 2004, Joseph and his wife, Alexandre, applied for asylum, withholding of removal and CAT relief. Alexandre had entered several weeks earlier.

On December 20, 2004, the Department of Homeland Security issued a Notice to Appear ("NTA") charging Joseph and Alexandre with staying in the United States beyond May 23, 2004 without authorization. Joseph and Alexander admitted the allegations in the NTA.

### A. Alleged Persecution

In his asylum application and hearing testimony, Joseph stated that he had been a police investigator with the Haitian National Police ("HNP") and claimed he was persecuted by pro-Lavalas HNP supervisors because he had assisted in United States criminal prosecutions. According to Joseph, the Lavalas Party was

2

trying to take control of and politicize the police department. Joseph's supervisors thought he was an agent for the United States and that he was working against the corrupt Haitian police force.

In 2000, Joseph worked closely with the United States embassy in Haiti as it investigated a visa fraud scheme. More recently, Joseph traveled to the United States and testified as a government witness in the federal criminal trial of Curtis Wharton, who was charged with murdering his wife while they were in Haiti.[1] According to Joseph, some of his supervisors did not like that Joseph had cooperated with the Wharton prosecution, and one supervisor, Alcius Guerby, testified on Wharton's behalf in the United States trial.

On October 21, 2003, after Joseph had testified, another supervisor, Jude Perrin, questioned Joseph about his cooperation on the Wharton case and asked if he was being paid by the United States to work against the Haitian government. Joseph felt threatened by Perrin and did not return to work afterward.

A week later, on October 27, 2003, Joseph's house was sprayed with gun fire. Just before the shooting began, Joseph heard someone who sounded like Guerby state that Joseph would "pay dearly" for working with the United States.

---

[1]Wharton was ultimately convicted of, among other things, foreign murder of a United States national. See United States v. Wharton, 320 F.3d 526 (5th Cir. 2003).

After the incident, Joseph's wife left for the United States, and Joseph went into hiding.

Joseph submitted an October 27, 2003 incident report prepared by a Haitian justice of the peace. The incident report stated that Joseph's house and a vehicle parked nearby were riddled with bullets and that shells of different caliber weapons were found on the ground. Joseph reported hearing a voice matching Guerby's state before the attack that Joseph had worked for the United States embassy and would pay for that dearly. Joseph also reported that the attack followed an October 21 interview by Jude Perrin of the Central Office of the Judiciary Police, who interrogated Joseph about his ties to United States embassy and his participation in the Wharton investigation.[2]

Two weeks later, Joseph received a call from Perrin ordering him to join another police investigator, Pierre Honale Bonnet, in a special operation. Like Joseph, Bonnet had assisted the United States with the Wharton prosecution and

_____

[2]At the hearing, Joseph introduced photographs of his home that he said a neighbor took after the 2003 shooting. However, the photographs were date-stamped April 15, 1997. The IJ continued the hearing so that the photographs could be forensically examined to determine their age, but the examination results were inconclusive. The IJ expressed concern about the photographs. On appeal, the BIA agreed with the IJ that the photographs were "suspicious." Joseph does not challenge this fact finding.

4

had been pressured by police supervisors. Unlike Joseph, however, Bonnet decided to return to work and was killed during the special operation.[3]

Joseph left Haiti for the United States on November 25, 2003. One of Joseph's neighbors wrote a letter stating that after Joseph's departure, armed men came to Joseph's home on several occasions looking for him and asking for information.

The 2005 Country Report on Human Rights Practices in Haiti states that arbitrary killings were committed by the HNP, former military forces opposing Aristide, Lavalas partisans and street gangs paid by Aristide. Much of the violence stemmed from the armed rebellion that ousted Aristide in February 2004. Armed attacks and common crime against civilians spread panic and fear. Pro-Lavalas partisans were responsible for violence and killings in Port-au-Prince, including the killing of police officers. In September 2004, during "Operation Baghdad," a surge of political violence that lasted several weeks, hundreds of people were killed and property was destroyed or burned. Many of the killings

---

[3]Joseph submitted a newspaper obituary announcing Bonnet's death and stating that a funeral would be held on November 25, 2003. The obituary did not give any details of how Bonnet had died.

were believed to have been carried out by pro-Lavalas gangs and some members of the HNP.[4]

The Country Report indicated that there was widespread corruption in all branches of the government. However, after Aristide resigned, the interim government made some progress reforming HNP by firing corrupt officers, conducting prompt investigations of human rights abuses, arresting suspected officers, shuffling leadership and inducting new recruits cleared by human rights organizations. By November 2005, more than fifty police officers had been fired or jailed on allegations of corruption.

Joseph also submitted several newspaper articles from October 2004 reporting waves of violence by pro-Aristide gangs in Haiti. These gangs murdered policemen, looted businesses and terrorized civilians as part of a systematic campaign to destabilize the country and facilitate Aristide's return to power.

## B.     Immigration Proceedings

The IJ denied all requested relief. The IJ concluded that Joseph was statutorily ineligible for asylum and withholding of removal because he had failed to show he was targeted because of a political opinion or an imputed political opinion. On appeal, the BIA affirmed and adopted the IJ's decision. The BIA also

---

[4]According to Joseph, another unnamed officer who cooperated with the Wharton prosecution disappeared during "Operation Baghdad."

noted that Joseph had failed to show how his cooperation with the United States created the impression that he was politically opposed to the Haitian government or Lavalas. The BIA concluded that, at most, the evidence showed that the attack on Joseph's house was a private act of violence. Joseph filed this petition for review.

## II. DISCUSSION

To be eligible for asylum, a petitioner must show that he suffered past persecution or has a well founded fear of future persecution "on account of" a protected ground. See INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A); see also 8 C.F.R. § 208.13(b). An imputed political opinion is a statutorily protected ground. See Al Najjar v. Ashcroft, 257 F.3d 1262, 1289 (11th Cir. 2001). A political opinion may be imputed if the persecutors mistakenly attribute a political opinion to the asylum applicant "and then persecute[ ] him because of that mistaken belief about his views." Id. (brackets omitted)

The alien must show not only that the persecutor imputed a political opinion to him, but also that the persecution was motivated by that imputed political opinion. See Rodriguez Morales v. U.S. Att'y Gen., 488 F.3d 884, 890 (11th Cir. 2007). Evidence of acts of private violence or criminal activity do not demonstrate persecution on a protected ground. Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1258 (11th Cir. 2006). We will not reverse a finding that an alien failed to demonstrate a nexus between the alleged persecution and the alien's actual or imputed political

7

opinion, unless the evidence compels the conclusion that the alien has been or will be persecuted "'because of' his political opinion." Rodriguez Morales, 488 F.3d at 890.[5]

Here, substantial evidence supports the finding that Joseph was a victim of criminal violence rather than political persecution.[6] Specifically, there is evidence in the record that: (1) the HNP has suffered from endemic corruption and its members have engaged in criminal violence and arbitrary killings; (2) pro-Lavalas partisans have killed police officers as part of a strategy to destabilize the country and bring former president Aristide back to power; (3) Joseph's pro-Lavalas HNP supervisors were corrupt and attempting to take control of the HNP; (4) these supervisors targeted Joseph because they saw his cooperation with the United States as a sign that he would fight against their corruption; and (5) since Aristide resigned from power, progress has been made to weed out corrupt and violent HNP

---

[5]Where, as here, the BIA adopts and affirms the reasoning of the IJ, we review the decisions of both the BIA and the IJ. Al Najjar, 257 F.3d at 1284. We review legal determinations de novo, D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 817 (11th Cir. 2004), and factual determinations under the substantial evidence test, Al Najjar, 257 F.3d at 1283. Under the highly deferential substantial evidence standard, we will reverse a finding of fact "only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc).

[6]We lack jurisdiction to consider Joseph's newly raised claim that he was persecuted on account of his membership in a particular social group–former HNP officers who cooperated with the United States–because Joseph failed to raise this particular social group argument with the BIA. See Amaya-Artunduaga v. U.S. Att'y Gen., 463 F.3d 1247, 1250 (11th Cir. 2006). We thus dismiss Joseph's petition with respect to this claim.

8

officials and reform the HNP.  These facts suggest Joseph's HNP supervisors were motivated, at most, by their own political opinions, not a political opinion they imputed to Joseph.  See Sanchez v. U.S. Att'y Gen., 392 F.3d 434, 437-38 (11th Cir. 2004) (explaining that it is the victim's, and not the persecutor's, political opinion that must motivate the persecution).

We cannot say the evidence compels a finding that Joseph was or will be persecuted on account of an imputed political opinion.  Because Joseph failed to carry his lower burden of proof with regard to asylum, he is also ineligible for withholding of removal.  See Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1288 n.4 (11th Cir. 2005).  Given the recent reforms made within the HNP, the evidence also does not compel a conclusion that Joseph would more likely than not be tortured by the Haitian government if returned to Haiti.

**DENIED IN PART, DISMISSED IN PART.**