[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-15722
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 2, 2010
JOHN LEY
CLERK

Agency No. A088-399-201

JEAN SERGE JOSEPH,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(July 2, 2010)

Before BLACK, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Jean Serges Joseph, a native and citizen of Haiti, has filed a petition for

review of the Board of Immigration Appeals' ("BIA") and the Immigration Judge's

("IJ") decisions denying him asylum and withholding of removal under the Immigration and Nationality Act, 8 U.S.C. §§ 1158, 1231 ("INA"). Joseph argues that the BIA and the IJ erred in finding that his testimony was not credible, and also asserts that the BIA and the IJ failed to consider evidence that corroborated his testimony that he suffered past persecution. Joseph further contends that he demonstrated a well-founded fear of future persecution. In addition, Joseph asserts that the BIA's and the IJ's decisions were flawed in several respects, specifically arguing that the IJ failed to analyze his claim of past persecution, and that the BIA and the IJ provided only conclusory reasoning in finding that he failed to demonstrate a well-founded fear of future persecution. Finally, Joseph argues that, due to the effects of a recent earthquake in Haiti, he cannot be returned to Haiti in a safe manner.

For the reasons set forth below, we dismiss Joseph's petition in part, and deny the petition in part.

## I.

In October 2007, Joseph filed an application for asylum and withholding of removal, alleging that he suffered past persecution and feared future persecution in Haiti based on his political opinion. In his application and supporting personal statement, Joseph claimed that he was persecuted due to both his political opinion and his mother's political activities. While she was in Haiti, his mother, Jenique

2

Assé, was a member of the Organization of People in Struggle ("OPL"). At the time that Joseph filed his application, Assé lived in Lake Worth, Florida.

In his application and personal statement, Joseph stated that, as a high school student, he had participated in a national essay contest. In his essay, Joseph stated that the morality of a nation's leaders can impact society as a whole. Later that same afternoon, Joseph received an anonymous, threatening telephone call. On December 12, 2006, Joseph was riding in a taxi when two armed individuals stopped the taxi, and dragged him outside of the taxi. The two armed individuals told Joseph that his mother had helped to plot and finance the overthrow of the Lavalas party (the political party that supported former Haitian President Jean Bertrand Aristide). The individuals further informed Joseph that they needed money for the return of Aristide, and that they would hold him for ransom until his mother gave them money. The kidnapers held Joseph captive for eight days. Joseph's mother negotiated with the individuals and gave them money. After the individuals released Joseph, Joseph hid at a friend's house until he left Haiti on December 30, 2006. Joseph explained that he feared that, if he were to return to Haiti, he would be killed by "chimeres" (violent individuals who sought the return of former President Aristide).

Joseph further supported his asylum application with a supplemental statement. In this statement, Joseph explained that his mother, Assé, had been

3

persecuted by Lavalas-party supporters due to her membership in the OPL. As a result of the persecution suffered by his mother, Joseph lived with an aunt for a period of time while he was in high school. Also as a result of this persecution, Assé was forced to leave Haiti, and she traveled to the United States. Joseph stated that he had been kidnaped by three men on December 12, 2006. A neighbor had informed Assé that Joseph had been kidnaped. Assé returned to Haiti from the United States on December 12, and subsequently paid a ransom of 30,000 Haitian dollars to Joseph's kidnapers.

The record included an asylum application filed by Assé in March 2007. In her application, Assé had alleged that she had suffered past persecution and feared future persecution in Haiti due to her political opinion. Although Assé provided details about numerous occasions on which she was harassed by Lavalas-party supporters, she did not mention that her son had been kidnaped, or that he had experienced harassment due to her political activities or his own political opinion.

The record also included the U.S. State Department's 2008 Country Report on Human Rights Practices in Haiti ("country report"). The country report provided that "armed and organized criminal elements" would kidnap individuals, and that most of these incidents were resolved by the payment of a ransom. The country report did not specifically address the topic of whether tension existed between Lavalas-party supporters and those who did not support the Lavalas party.

4

In addition, Joseph submitted several news articles, which generally reported that numerous individuals were kidnaped in Haiti between 2004 and 2006, and that it was suspected that many of these incidents were politically motivated.

Joseph appeared at a hearing before the IJ in Miami, Florida. At the hearing, Joseph testified that, in his essay, he had stated that former President Aristide had a negative influence on Haiti. Approximately two months after it was announced that he had won an award in the essay contest, Joseph began to receive threatening telephone calls. Joseph further testified that, on November 8, 2006, he was riding in a taxi when approximately three men stopped the taxi and dragged him outside of the taxi. Joseph next stated that approximately three or four men had taken him outside of the taxi, and explained that he had not been able to see very well because it was dark. Joseph gave the kidnapers the telephone number of one of his neighbors, Robert Mack. After the kidnapers called Mack, Mack called Assé, who was in the United States, to inform her that Joseph had been kidnaped. The kidnapers released Joseph on December 17, 2006. Immediately after he was released, Joseph went to stay at the home of a friend, Honore Jentil. Joseph stated that he stayed with Jentil for "a couple of days." Joseph next stated that he stayed with Jentil from December 17 until December 30, when Joseph left Haiti to travel to the United States. Assé had reserved Joseph's flight to the United States.

5

On cross-examination, Joseph testified that he had been kidnaped on December 9, 2006, instead of November 8, 2006. When asked why Assé did not mention his kidnaping in her asylum application, Joseph responded that he did not know anything about the information that Assé had included in her asylum application. When asked why Assé was not present at the hearing to offer her testimony, Joseph responded that he had not spoken with Assé for months. After Joseph provided this response, the following exchange occurred:

Government: Is there a reason your mother is not here to testify on your behalf in support of your asylum application since she's the one that apparently paid 30,000 Haitian dollars for ransom for your kidnaping?

Joseph: After she was denied. She could not—she did not have any option. After her application was denied she—did not give her any, any option.

On redirect examination, Joseph stated that he had not spoken with Assé since June 2008 because he did not behave in the manner in which she wished for him to behave.

The IJ denied relief. The IJ found that Joseph's testimony was not credible. The IJ noted that, despite the fact that Joseph's mother lived in southern Florida, she did not provide corroborating testimony at the hearing. The IJ found that Joseph's explanation for his mother's absence—that they did not communicate often because he did not behave in the manner in which she wished for him to

6

behave—was not credible. As further support for his adverse credibility finding, the IJ noted that, in her asylum application, Assé did not mention that Joseph had been kidnaped, or that he had lived with his aunt due to her problems with the Lavalas supporters. The IJ found that Joseph had testified inconsistently with his written statements regarding the number of men who had kidnaped him. Moreover, the IJ noted, Joseph had testified on direct examination that he was kidnaped on November 8, 2006, but had testified on cross-examination that he was kidnaped in December 2006. The IJ determined that the evidence in the record, together with Joseph's incredible testimony, did not establish past persecution or a well-founded fear of future persecution. Accordingly, the IJ concluded that Joseph had failed to demonstrate that he was eligible for asylum, and thus necessarily had failed to establish his eligibility for withholding of removal. Joseph appealed from the IJ's decision to the BIA.

The BIA dismissed Joseph's appeal, finding that the IJ's adverse credibility determination was not erroneous. In support of this finding, the BIA explained that the IJ's adverse credibility finding was based on "actual inconsistencies" among Joseph's testimony, his written statements, and the documentary evidence that he presented. The BIA determined that Joseph did not persuasively resolve these inconsistencies in his testimony, and that his testimony was "further undercut" by his failure to provide documentary or testimonial evidence that corroborated his

7

own testimony. Because the BIA affirmed the IJ's adverse credibility determination, it found that it also should affirm the IJ's denial of asylum and withholding of removal.

## II.

Where the BIA issues its own decision, we review only that decision, "except to the extent that it expressly adopts the IJ's opinion." *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1284 (11th Cir. 2001). However, "[i]nsofar as the Board adopts the IJ's reasoning, we review the IJ's decision as well." *Id.* Here, the BIA issued its own opinion, in which it did not expressly adopt the IJ's reasoning. The BIA did, however, expressly review, and state its agreement with, the IJ's reasons for denying relief. Accordingly, to the extent that the BIA expressly agreed with the IJ's reasoning, we review both the BIA's and the IJ's opinions.[1]

When evaluating a decision by the BIA or the IJ to deny relief, we review findings of fact under the "substantial evidence test," and must affirm the decision if it is "supported by reasonable, substantial, and probative evidence on the record

---

[1] In his petition, Joseph does not argue that the BIA and the IJ erred in denying his claim for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT relief"). As a result, Joseph has abandoned any argument that he is eligible for CAT relief. *See Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (noting that the petitioner abandoned an argument by failing to raise it in her initial brief).

considered as a whole." *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1286 (11th Cir. 2005) (quotation omitted).

We review credibility determinations under the substantial evidence test, and we "may not substitute [our] judgment for that of the BIA with respect to credibility findings." *D-Muhumed v. U.S. Att'y Gen.*, 388 F.3d 814, 818 (11th Cir. 2004). In order to review a credibility determination, the IJ or BIA must explicitly state that the applicant's testimony was not credible. *See Yang v. U.S. Att'y Gen.*, 418 F.3d 1198, 1201 (11th Cir. 2005). A credibility determination, like any fact finding, may not be overturned unless the record compels it. *Forgue*, 401 F.3d at 1287 (quotation omitted).

An alien who arrives in or is present in the United States may apply for asylum. INA § 208(a)(1), 8 U.S.C. § 1158(a)(1). The Attorney General or the Secretary of the DHS has discretion to grant asylum if the alien meets the INA's definition of a "refugee." INA § 208(b)(1), 8 U.S.C. § 1158(b)(1). A "refugee" is:

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

9

8 U.S.C. § 1101(a)(42)(A). The asylum applicant carries the burden of proving statutory "refugee" status. *Al Najjar*, 257 F.3d at 1284.

To establish asylum eligibility, the alien must, with specific and credible evidence, establish (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that the statutorily listed factor will cause future persecution. 8 C.F.R. § 208.13(a), (b); *Rodriguez-Morales v. U.S. Att'y Gen.*, 488 F.3d 884, 890 (11th Cir. 2007). If the alien establishes past persecution, it is presumed that his life or freedom would be threatened upon return to the country of removal. 8 C.F.R. § 208.13(b). An alien who has not shown past persecution may still be entitled to asylum if he can demonstrate a future threat to his life or freedom based on a protected ground in his country. 8 C.F.R. §§ 208.13(b)(2), 208.16(b)(2). To establish a "well-founded fear," an applicant must show that he has a fear of persecution in his home country, and that "there is a reasonable possibility of suffering such persecution if he or she were to return to that country." 8 C.F.R. § 209.13(b)(2)(i). When a petitioner fails to "establish a claim of asylum on the merits, he necessarily fails to establish eligibility for withholding of removal." *Forgue*, 401 F.3d at 1288 n.4.

If credible, an alien's testimony may be sufficient, without corroboration, to sustain his burden of proof in establishing his eligibility for relief from removal. *Yang*, 418 F.3d at 1201. "The weaker an applicant's testimony, however, the greater

the need for corroborative evidence." *Id.* "Conversely, an adverse credibility determination alone may be sufficient to support the denial of an asylum application." *Forgue*, 401 F.3d at 1287. Pursuant to the REAL ID Act of 2005 ("RIDA"), Congress has directed the immigration courts to base credibility determinations on the totality of the circumstances, which may include inaccuracies or falsehoods that do not go to the "heart of the applicant's claim."[2] Pub. L. No. 109-13, 119 Stat. 231, § 101(a)(3); 8 U.S.C. § 1158(b)(1)(B)(iii); *Chen v. U.S. Att'y Gen.*, 463 F.3d 1228, 1233 (11th Cir. 2006). The BIA or the IJ "must offer specific, cogent reasons for an adverse credibility finding." *Forgue*, 401 F.3d at 1287. "Once an adverse credibility finding is made, the burden is on the applicant alien to show that the [] credibility decision was not supported by 'specific, cogent reasons' or was not based on substantial evidence." *Id.*

In evaluating an alien's claim for asylum and withholding of removal, the IJ is required to consider the evidence adequately, and give reasoned consideration to the alien's claims. *Tan v. U.S. Att'y Gen.*, 446 F.3d 1369, 1376-77 (11th Cir. 2006). Where an IJ has given "reasoned consideration" to the alien's application, it is not required that the IJ "address specifically each claim the petitioner made or each piece of evidence the petitioner presented." *Id.* (quotation omitted).

---

[2] The RIDA states that these provisions "shall apply to applications for asylum, withholding, or other relief from removal made on or after" the date of enactment of the Act, May 11, 2005, and, thus, the provisions affect this appeal. Pub. L. No. 109-13, 119 Stat. at 305.

Here, we may review the BIA's and the IJ's adverse credibility determinations, because both the BIA and the IJ expressly stated that Joseph's testimony was not credible. The BIA and the IJ provided specific, cogent reasons for their adverse credibility determinations, and these determinations were supported by substantial evidence. In his supplemental statement, Joseph averred that he was kidnaped by three men on December 12, 2006. In his personal statement, he stated that he was kidnaped by two armed individuals. During his hearing testimony, Joseph first stated that he was kidnaped by three or four men on November 8, 2006. On cross-examination, however, he stated that he was kidnaped on December 9, 2006.

Moreover, Assé failed to mention Joseph's kidnaping in her asylum application, despite the following: (1) Assé filed her asylum application in March 2007, after Joseph allegedly was kidnaped; (2) she allegedly had flown to Haiti from the United States, met with the kidnapers and paid 30,000 Haitian dollars for Joseph's release, and thereafter reserved a plane ticket for Joseph to fly to the United States; (3) the kidnapers allegedly had kidnaped Joseph due, at least in part, to Assé's political activities; and (4) Joseph allegedly had lived with his aunt for a period of time due to the political persecution suffered by Assé. When asked why Assé did not appear at the hearing to testify regarding his kidnaping, despite the fact that she lived in South Florida, Joseph failed to provide a responsive answer, and ultimately stated

12

only that he and his mother had not spoken for months because he did not behave as she wished.

In addition to the above inconsistencies, Joseph averred, in his written statements, that he began to receive threatening telephone calls on the same day on which he wrote his essay for the national essay competition. In his testimony, Joseph stated that he did not receive these telephone calls until approximately two months after it was announced that he had won a prize in the competition. Moreover, Joseph testified that, after the kidnapers released him, he stayed with his friend, Jentil, for "a couple of days," and then stated that he stayed with Jentil between December 17 and December 30, 2006—a period of almost two weeks. Due to the numerous discrepancies detailed above, substantial evidence supports the BIA's and the IJ's adverse credibility findings.

Joseph's claim that his testimony was corroborated by documentary evidence lacks merit. Although the news articles that Joseph submitted demonstrated that many kidnapings occurred in Haiti during 2004 and 2005, these articles did not compensate for the lack of evidence showing that Joseph was kidnaped. The record did not contain any evidence, such as affidavits from Assé, Jentil, Mack, or the aunt that Joseph had lived with while his mother was experiencing difficulty, that corroborated Joseph's claims that he received threatening telephone calls, or that he was kidnaped.

Because Joseph's testimony was not credible, and he did not submit any evidence that corroborated his claims that he received threatening telephone calls and was kidnaped, substantial evidence supports the BIA's and the IJ's determinations that Joseph did not establish past persecution. In addition, in light of the fact that Joseph lacked credibility, and that the 2008 country report did not mention that Haiti continued to experience problems of violence from Lavalas-party supporters, substantial evidence supports the BIA's and the IJ's decisions that Joseph did not establish a well-founded fear of future persecution. Because substantial evidence supports the BIA's and the IJ's determinations that Joseph did not demonstrate his eligibility for asylum, substantial evidence likewise supports their finding that he was not eligible for withholding of removal.

Joseph's additional challenges to the BIA's and the IJ's decisions also lack merit. In this regard, we note that both the BIA and the IJ provided sufficient reasoning in support of their decisions to deny Joseph's claims that he suffered past persecution and demonstrated a well-founded fear of future persecution.

## III.

In order to properly raise an argument, a petitioner must do more than make a "passing reference" to the argument. *See Sepulveda*, 401 F.3d at 1228 n.2.

Pursuant to 8 U.S.C. § 1254a, the Attorney General may grant temporary protected status ("TPS") to an alien whose nation of origin has been designated as a

14

nation that has been substantially and temporarily affected by a natural disaster such as an earthquake or a flood. 8 U.S.C. § 1254a(a)(1) and (b)(1)(B)(i). The statute further provides that:

> The Attorney General shall establish an administrative procedure for the review of the denial of benefits to aliens under this subsection. Such procedure shall not prevent an alien from asserting protection under this section in removal proceedings if the alien demonstrates that the alien is a national of a state designated [by the Attorney General].

8 U.S.C. § 1254a(5)(B). On January 21, 2010, the Attorney General announced that, for a period of 18 months, Haitian nationals who are in the United States and who meet certain criteria are eligible for TPS. Designation of Haiti for Temporary Protected Status, 75 Fed. Reg. 3476 (January 21, 2010).

An alien may apply for TPS outside of removal proceedings by registering his application for this status with the United States Citizenship and Immigration Services ("USCIS"). *See Mejia Rodriguez v. U.S. Dep't of Homeland Sec.*, 562 F.3d 1137, 1140 (11th Cir. 2009) (explaining that "initial statutory eligibility determinations for TPS are not made by an immigration judge, but rather by the staff at local USCIS service centers").

Here, to the extent that Joseph argues that the recent earthquake in Haiti should affect our review of whether he demonstrated past or future persecution, this argument lacks merit, as the question of whether an earthquake has created

15

dangerous conditions in Haiti is not relevant to these issues. Moreover, Joseph does not assert on appeal that he is eligible for TPS, nor does he cite to any statute or case law pertaining to TPS. As a result, Joseph has failed to properly raise this issue. In this regard, we note that Joseph may raise the issue of whether he is eligible for TPS in proceedings before the USCIS.

Accordingly, to the extent that Joseph's argument concerning the earthquake in Haiti constitutes an argument that the earthquake should affect our review of his claims of past persecution and future persecution, we deny his petition. To the extent that this argument could be construed as a request for TPS, we dismiss Joseph's petition because he has failed to properly raise this argument.

**PETITION DENIED IN PART, DISMISSED IN PART.**