[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-12766
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 11, 2012
JOHN LEY
CLERK

Agency No. A087-380-029

ION ZAPOROJAN,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(January 11, 2012)

Before EDMONDSON, HULL and FAY, Circuit Judges.

PER CURIAM:

Ion Zaporojan, a citizen of Moldova and Romania, petitions for review of the Board of Immigration Appeals's ("BIA") order affirming the Immigration Judge's ("IJ") denial of his application for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), and relief under the United Nations Convention Against Torture ("CAT"). After review, we deny the petition for review.

## I. BACKGROUND FACTS

### A. Removability

In May 2006, Zaporojan entered the United States from Moldova on an exchange-visitor visa, which permitted him to remain until September 26, 2006. Zaporojan overstayed his visa. In January 2009, Zaporojan filed an application for asylum, withholding of removal and CAT relief, claiming past persecution in 2005 and a well-founded fear of future persecution in Moldova because of his imputed political opinion and membership in a particular social group.

In March 2009, the Department of Homeland Security issued a Notice to Appear ("NTA"), charging Zaporojan with being removable, pursuant to INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B), for remaining in the United States longer than permitted. At a master calendar hearing, Zaporojan admitted the allegations

in the NTA and conceded removability.

## B.     Persecution Evidence

According to Zaporojan's application and his testimony at his removal

hearing, Zaporojan's father was a businessman and local politician in Soroca,

Moldova, who fought corruption.  Beginning in 2004, Zaporojan's father

participated in an undercover investigation into a scheme of extortion and bribery

by the mafia and public officials.  On January 12, 2005, Zaporojan's father

disappeared.  Zaporojan's father was scheduled to testify against a local mafia

member who had been extorting money from him.  On January 13, his father's

body was found on the outskirts of Soroca with a shotgun wound to the head.

A few days after the killing, a local journalist gave Zaporojan's mother an

audio cassette tape containing a recording of Zaporojan's father.  On the

audiotape, Zaporojan's father was talking with high-ranking Moldovan officials a

few days before his death.[1]  Although the journalist warned the family not to tell

---

[1]The contents of the tape were not transcribed and put in the record.  During the removal
hearing, a portion of the tape was played in which Zaporojan's father was crying and talking
emotionally with the deputy mayor.  Zaporojan's affidavit states that the tape contained his
father's conversations with high-level officers with the Ministry of Internal Affairs of the
Republic of Moldova about the extortion and also telephone conversations with local officials.
     Zaporojan avers that although the audio cassette tape "did not have much information that
could really hurt those who were recorded," neither the police nor the mafia "know what had
been recorded exactly in that audio cassette and it bothers them."  In his hearing testimony,
Zaporojan stated that on the cassette tape his father "tells about all the high-ranked political
figures, about everything, every unjust fact done in our country, about the attorneys who took

anyone about the tape, information eventually leaked.

In May 2005, Zaporojan's brother called the police to inquire about the progress of the investigation into his father's murder. A few days later, two strangers beat Zaporojan's brother while he was walking home. The attackers told Zaporojan's brother to keep his nose out of things that were none of his business. Zaporojan's brother later received anonymous phone calls warning him to "stay out of their business." In late 2005, Zaporojan's mother and brother left Moldova. Zaporojan, however, stayed to complete his college studies in Moldova's capital, Chisinau.

In February 2006, while walking in Soroca, Zaporojan was forced into a police car. Officers took Zaporojan to the basement of a police station, where they beat him and demanded to know where the cassette tape was located. The next morning, Zaporojan was released and treated at the hospital for a concussion and bruises. About a month later, Zaporojan received an anonymous phone call stating that if he did anything, his life would be in danger. In May 2006, Zaporojan decided to leave Moldova and join his brother in the United States.

According to the U.S. State Department's 2009 Country Report for Moldova, corruption is pervasive throughout the Moldovan government and

_____

bribes."

society.  An expert testified that the mafia essentially controls the Moldovan government.  The expert also testified that, other than Romania and the border area of Russia, the Moldovan mafia does not have much influence in the rest of Europe. The expert opined that if the Moldovan mafia really wanted to, it could "haunt its opponents" in any country in the European Union ("E.U.") because the E.U. has no enforcement authority and "is still more an idea than an actual effectively operating government."  When Zaporojan was asked why the Moldovan mafia would continue to target Zaporojan outside Moldova, Zaporojan responded, "Because they are aware we have this tape . . . ."

## C.    Romanian Citizenship and Zaporojan's Mother

Although citizens of Moldova, Zaporojan, his mother and his brother have also obtained Romanian citizenship, which entitles them to live and work anywhere in the E.U.  In fact, Zaporojan's mother lives in Italy.

Zaporojan's mother has not been harmed or threatened in Italy, but she reports that Moldovan people working in Italy are sometimes threatened and extorted by the Moldovan mafia.  While grocery shopping, Zaporojan's mother once noticed individuals who "look[ed] different," with "[t]heir hair . . . cut short, they look[ed] athletic, shorter people," and she "got scared and doesn't go out anymore."

In June 2008, Zaporojan's mother returned to Moldova to sell the family home. While visiting her husband's grave, Zaporojan's mother was attacked by unknown assailants and had to be hospitalized before she could return to Italy.

## D.     Decisions of the IJ and the BIA

The IJ credited Zaporojan's hearing testimony, but denied all relief. Among other things, the IJ determined that Zaporojan was statutorily ineligible for asylum and withholding of removal because: (1) as to past persecution, he had not shown a nexus between the harm he suffered and a statutorily protected ground; (2) as to future persecution, his Romanian citizenship permitted him to relocate outside Moldova and in the E.U. countries, where there was no evidence he would be harmed; and (3) as to CAT relief, he had not shown he would be tortured by the Moldovan authorities.[2]

The BIA dismissed Zaporojan's appeal. The BIA agreed with the IJ's finding that Zaporojan had not shown that a protected ground was at least one central reason for the past harm he had suffered. The BIA noted that Zaporojan's

---

[2]The IJ found that Zaporojan's 2009 asylum application was untimely and that Zaporojan failed to establish an exception to the one-year filing requirement. The BIA declined to address the issue of the timeliness of Zaporojan's asylum application because, even if Zaporojan established he warranted an exception, his asylum claim still failed because he did not demonstrate that a protected ground was at least one central reason for his 2006 attack. Because the BIA did not adopt the IJ's finding as to timeliness, we do not address that issue. See Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001) (stating that we review the BIA's decision "except to the extent it expressly adopts the IJ's opinion").

attackers were not motivated by his imputed political opinion based on his father's anti-corruption efforts or Zaporojan's familial relationship to his father. Rather, the details of the attack demonstrated that Zaporojan's attackers were motivated by a desire to prevent the discovery of evidence of corruption on the audio cassette tape.

The BIA also agreed with the IJ's finding that Zaporojan had not shown a well-founded fear of persecution because his Romanian citizenship would allow him to settle anywhere in the E.U., the Moldovan mafia did not have much influence outside of Moldova, and Zaporojan's mother's suspicions that the Moldovan mafia was present in Italy was not sufficient to show that Zaporojan would be harmed outside Moldova. Although Zaporojan did not challenge the denial of CAT relief, the BIA sua sponte concluded that Zaporojan failed to establish a likelihood of torture.[3] Zaporojan filed this petition for review.

## II. DISCUSSION

### A. Past Persecution Claim

---

[3]Zaporojan did not challenge the denial of CAT relief before the BIA or in his brief to this Court. Therefore, we do not address his CAT claim. See Kazemzadeh v. U.S. Att'y Gen., 577 F.3d 1341, 1352 (11th Cir. 2009) (deeming abandoned petitioner's CAT claim to which petitioner's brief made only a passing reference); Amaya-Artunduaga v. U.S. Att'y Gen., 463 F.3d 1247, 1250 (11th Cir. 2006) (explaining that, pursuant to INA § 242(d)(1), 8 U.S.C. § 1252(d)(1), we lack jurisdiction to review issues not raised before the BIA even if the BIA sua sponte considered the issue).

On appeal, Zaporojan argues that he established a nexus between the harm he suffered in Moldova and his membership in a particular social group, namely, the family of his murdered father.[4]

To establish eligibility for asylum, an applicant must show either past persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group or political opinion.[5] INA § 101(a)(42); 8 U.S.C. § 1101(a)(42)(A); Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1230-31 (11th Cir. 2005); 8 C.F.R. § 208.13(a)-(b).[6] Under the REAL ID Act of 2005, the asylum applicant must show that one of the protected grounds "was or will be at least one central reason" for the persecution. INA § 208(b)(1)(B)(i), 8 U.S.C. § 1158(b)(1)(B)(i) (emphasis added); see Pub. L. No.

---

[4]On appeal, Zaporojan does not advance his persecution claims based on imputed political opinion and thus abandons them. See Kazemzadeh, 577 F.3d at 1352.

[5]Similarly, an alien seeking withholding of removal must show that it is more likely than not that he will be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion upon being returned his country. INA § 241(b)(3), 8 U.S.C. § 1231(b)(3); Sepulveda, 401 F.3d at 1232. Because this standard is more stringent than the standard for asylum, an alien who fails to establish asylum eligibility generally cannot satisfy the higher burden for withholding of removal. Id. at 1232-33.

[6]The INA does not define what constitutes persecution on account of "membership in a particular social group." The BIA assumed arguendo that Zaporojan's family constituted a "particular social group" within the meaning of the INA. On appeal, the parties do not dispute that a family constitutes a particular social group. Accordingly, we do not reach this issue.

109-13, § 101(a)(3), 119 Stat. 231, 302-03 (2005) (amending 8 U.S.C. § 1158).[7]

Evidence of acts of private violence or criminal activity do not demonstrate persecution on account of a protected ground. Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1258 (11th Cir. 2006).[8]

Here, we cannot say the evidence compels a conclusion that one of the central reasons the Moldovan police and mafia targeted Zaporojan was his family relationship to his father. Rather, substantial evidence supports the conclusion that the Moldovan police and mafia were driven by a desire to retrieve the audio cassette that a journalist gave his mother because it contained incriminating evidence of corruption by high-ranking Moldovan officials. In fact, Zaporojan testified that the police detained and beat him because they were trying to find the audio cassette and that he believed the mafia would continue to target him because the mafia knew about the audio cassette. Moreover, Zaporojan testified that the attacks on his family (apart from his father's murder) did not begin until after the

---

[7]Because Zaporojan's 2009 application was filed after May 11, 2005, the REAL ID Act's provisions apply to his case. See Pub. L. No. 109-13, § 101(h)(2), 119 Stat. at 305-06.

[8]The BIA issued its own decision, but agreed with the IJ's reasoning that Zaporojan failed to establish a nexus to a statutorily protected ground. Thus, we review the decisions of both the IJ and the BIA as to that issue. See Kazemzadeh, 577 F.3d at 1350. We review the determination that an alien is statutorily ineligible for asylum or withholding of removal under the "highly deferential" substantial evidence test. Al Najjar, 257 F.3d at 1284. Under the substantial evidence standard of review, we will reverse a finding that the applicant failed to show the required nexus only if the record compels a finding to the contrary. See Rodriguez Morales v. U.S. Att'y Gen., 488 F.3d 884, 891 (11th Cir. 2007).

mafia and police learned about the audio cassette. There is also no evidence that Zaporojan himself had ever fought corruption either individually or with his father. Instead, the attacks are, by his own testimony, to obtain the audio cassette tape. In short, the mistreatment Zaporojan alleges was akin to acts of criminal violence, which do not constitute persecution on account of a protected factor.

**B.    Future Persecution Claim**

Substantial evidence also supports the determination that Zaporojan failed to demonstrate a reasonable possibility of future persecution. If an asylum applicant cannot establish past persecution (and thus benefit from a presumption of future persecution), he may still establish a well-founded fear of persecution by showing that there is a reasonable possibility he will be persecuted on account of a protected factor and that he has a subjectively genuine fear that he will be so persecuted. Kazemzadeh, 577 F.3d at 1352. If the asylum applicant can avoid the feared persecution by relocating, and it would be reasonable to expect the applicant to do so, he cannot establish a well-founded fear. Id.; see also 8 C.F.R. §§ 1208.13(b)(2)(ii), 208.16(b)(3)(i).

For the reasons already stated, the prior attacks on Zaporojan, his brother and his mother do not provide a reasonable basis for fearing persecution on account of the family relationship to Zaporojan's father. In any event, substantial

10

evidence supports the BIA's finding that Zaporojan could avoid future harm by relocating. First, Zaporojan admitted that none of the attacks occurred outside the family's hometown of Soroca. Second, as a Romanian citizen, Zaporojan can live and work anywhere in the E.U. The expert testified that the Moldovan mafia did not have a significant influence outside of Romania and the border with Russia. The fact that the Moldovan mafia could theoretically pursue someone anywhere in the E.U. does not compel a conclusion that the Moldovan mafia will do so in Zaporojan's case. This is especially true given that Zaporojan's mother has lived unthreatened in Italy since late 2005, and her own fears of the Moldovan mafia's presence in Italy appear to be at best speculative.

**PETITION DENIED.**