[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 15-13706; 15-15481
_____

Agency No. A098-381-313


FREDDY JOSE ARGUELLES,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.


_____

Petitions for Review of a Decision of the
Board of Immigration Appeals
_____

(November 23, 2016)

Before HULL and MARTIN, Circuit Judges, and WRIGHT,[*] District Judge.

HULL, Circuit Judge:

---

[*] Honorable Susan Webber Wright, United States District Judge for the Eastern District of Arkansas, sitting by designation.

Freddy Jose Arguelles, a native and citizen of Venezuela and former Venezuelan Air Force pilot, has filed a petition for review of the Immigration Judge's and Board of Immigration Appeals' ("BIA") denial of his applications for asylum, withholding of removal, adjustment of status, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT").  After the BIA ruled, Arguelles sought reopening of his case from the BIA, which was denied.  Arguelles filed a separate petition for review of the BIA's denial of reopening.  This Court has consolidated his two petitions.

After careful review of the record and the parties' briefs, and with the benefit of oral argument, we deny Arguelles's petitions for review, affirm the BIA's July 23, 2015 final order of removal to Venezuela, and affirm the BIA's December 7, 2015 denial of reopening.

## I.  BACKGROUND

In March 2004, Arguelles entered the United States on a nonimmigrant visitor's visa.  Arguelles is a former Venezuelan Air Force pilot.  In July 2004, the Department of Homeland Security ("DHS") granted him asylum on the basis that he would be persecuted in Venezuela due to his 2002-2003 participation in demonstrations against President Hugo Chavez and membership in the group

Militares Democraticos.  In 2006, Arguelles's status was adjusted to lawful permanent resident ("LPR").

## A.    Criminal Conviction in 2012

In the 1980's the United States sold F-16 airplanes to Venezuela, but sales of the parts for those airplanes are now restricted.  On June 25, 2012, Arguelles was indicted for knowingly and willfully conspiring to export defense articles, including F-16 parts, designated on the United States Munitions List (the "Munitions List") in violation of the Arms Export Control Act (AECA) in 22 U.S.C. § 2778(b)(2), without first obtaining the required license or written approval from the United States Department of State (the "State Department").  Section 2778 permits the President to designate defense articles and services to the Munitions List and prohibits the export of those items without a license.  22 U.S.C. § 2778(a)(1), (b)(2).

On October 5, 2012, Arguelles pleaded guilty to conspiracy to export defense articles in violation of the AECA, 22 U.S.C. § 2778(b)(2), and 18 U.S.C. § 371.  The district court sentenced Arguelles to 23 months' imprisonment.  The "stipulated factual basis" accompanying Arguelles's plea agreement contains the following facts.

Arguelles admitted that he, a former military pilot, and Alberto Pichardo, another former Venezuelan Air Force officer living in the United States,

3

knowingly and willfully conspired, from January 2009 until February 2010, to procure and supply to the Venezuelan Air Force defense articles designated on the Munitions List.  Arguelles and Pichardo did not obtain a license or written approval from the State Department to make such sales.

Co-conspirators from outside the United States informed Arguelles and Pichardo that the Venezuelan Air Force wished to purchase certain defense articles.  Arguelles and Pichardo attempted to procure the requested items from Phillip Klokke, a government informant.[1]  Pichardo sent these five emails to Klokke regarding items on the Munitions List: (1) on or about January 23, 2009, discussing F-16 ejection seats and F-16 munitions, including AIM-9 Sidewinder missiles, Python-4 missiles, rocket launchers, 250-pound bombs, 500-pound bombs, Paveway laser-guided bomb kits, .50 caliber ammunition for Gatling guns, AMRAAM missiles, and AGM-54 missiles; (2) on or about February 23, 2009, seeking aircraft parts, including Cartridge Assemblies, Detonation Transfer Assemblies, and Initiators; (3) on or about March 27, 2009, resending the February 23 list; (4) on or about August 4, 2009, listing F-16 aircraft parts such as Rocket Motor Canopy Jettisons, Cartridge Assemblies, Drive Shafts, Bulkheads, LPRF Radars, XMTR Radars, Radar Antennas, and Oxygen Mask Facepieces; and (5) on or about October 23, 2009, discussing other F-16 parts, including radar equipment.

---

[1]The stipulated factual basis refers to this individual as "S-1" and does not identify S-1 as a government informant, although the government now admits that it refers to Klokke.

On or about September 22, 2009, Arguelles, Pichardo, and a co-conspirator, "K.L.,"[2] attended a meeting with Klokke and discussed the sale of F-16 parts requested by the Venezuelan Air Force. On or about October 26, 2009, Arguelles met again with Pichardo and Klokke and discussed the F-16 parts as well as the sale of unmanned aerial vehicle engines to Venezuela. Also on or about October 26, 2009, Arguelles had a telephone conversation with Klokke regarding the sale of the unmanned aerial vehicle parts. On or about November 12, 2009, Arguelles, Pichardo, and Lezama met with Klokke and discussed the sale of the F-16 parts and unmanned aerial vehicle engines to Venezuela.

The government had copies or transcripts of emails, text messages, phone calls, and meetings of Arguelles and his co-conspirators regarding the purchase and delivery of the defense articles to Venezuela. The co-conspirators' activities occurred from January 2009 to February 2010.

During the government's investigation, Arguelles admitted to his "knowing and willful participation" in the conspiracy, that he was aware that his actions were illegal, and that he participated in the enterprise "for the money." Arguelles stipulated that his conduct "was harmful to the security and foreign policy interests of the United States."

---

[2] "K.L." being Karin Lezama.

**B.      Removal in 2014**

Based on Arguelles's criminal conviction, DHS served him with a notice to appear ("NTA") on June 5, 2014.  The NTA alleged that Arguelles was removable under 8 U.S.C. § 1227(a)(4)(A)(i) because he engaged "in any activity to violate any law of the United States relating to espionage or sabotage or to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information." (emphasis added); see Immigration and Nationality Act ("INA") § 237(a)(4)(A)(i), 8 U.S.C. § 1227(a)(4)(A)(i).  The NTA recounted Arguelles's guilty plea, sentence, and factual stipulation to having knowingly and willfully conspired to export defense articles on the Munitions List to Venezuela without approval from the State Department.

At his hearing on July 2, 2014, Arguelles denied that his conviction was for a crime of espionage or sabotage and that he was removable.  He argued that his conviction was for violating an export law and was more akin to a regulatory violation than a crime and thus was not a particularly serious crime or a crime of moral turpitude.  The immigration judge ("IJ") disagreed and, relying on the judgment and factual information from his criminal case, found Arguelles removable by clear and convincing evidence.

The IJ's written decision stated that the IJ "sustained the charge of removability under section 237(a)(4)(A)(i)," which is 8 U.S.C. § 1227(a)(4)(A)(i).

6

That section makes removable "any alien who has engaged" in "any activity to violate any law of the United States relating to espionage or sabotage or to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information." 8 U.S.C. § 1227(a)(4)(A)(i). Based on the guilty plea and stipulated facts, the IJ concluded that Arguelles had engaged in an activity that violated United States export laws.

## C.    2014 Application for Asylum, Withholding, & CAT Relief

Subsequently, Arguelles filed an application for asylum, withholding of removal, and CAT relief. Arguelles's application claimed that he feared persecution because of his political opinion and membership in a particular social group. He explained that he was a member of an elite unit of the Venezuelan Air Force and an opponent of the Chavez government. Arguelles focused on events that occurred back in 2002 to 2004. In 2002, Arguelles and his fellow officers protested in Plaza Francia in the Altamira neighborhood of Caracas. They became known as "the group of Altamira" and remained in the Plaza for over a year. The organizations involved in the protest, of which Arguelles was a member, were formally known as the Military for Democracy and the Institutional Military Front.

On December 6, 2002, a shooter with ties to President Chavez's administration killed 3 demonstrators and injured 20 more. The Venezuelan government jailed and killed some of the other participants over the course of the

7

year.  Arguelles was discharged from the Air Force and stripped of his benefits.

While other participants were jailed or killed, Arguelles received asylum in the

United States.

In 2004, the Venezuelan government charged Arguelles with a crime based

on his peaceful protest activities.  Arguelles claimed that if he returned to

Venezuela, he would be incarcerated and tortured because the charges against him

are still pending and there is an outstanding warrant for his arrest.  Arguelles stated

that he was a prominent member of the protest group and still opposes the

communist government, which is now run by President Nicolas Maduro.

Arguelles claimed that one of his friends and mentors in the Air Force was arrested

in 2014 for allegedly plotting a coup, which demonstrates that the government is

still suspicious of the Air Force.  Lastly, Arguelles alleged that his wife, who is a

U.S. citizen, would be in danger in Venezuela because she was one of the attorneys

who represented the group of Altamira.

## D.    2014 Application for Adjustment of Status & Waiver

Later in August 2014, Arguelles filed an application for (1) adjustment of

status and (2) a waiver of his ground of inadmissibility based on hardships to his

family if he returned to Venezuela.  Arguelles again contended that his conviction

was for a regulatory or licensing violation and was not a crime of moral turpitude.

Alternatively, Arguelles sought a waiver on the basis that his U.S. citizen wife,

children, and permanent resident mother would suffer extreme hardship if a waiver was not granted.

## II.    2015 HEARING ON APPLICATIONS

In January 2015, the IJ held a hearing on the merits of Arguelles's applications.

### A.    Arguelles's Testimony

Arguelles entered the United States in 2004 at the age of thirty and was thirty-eight at the time of his conviction.  According to Arguelles, he signed the stipulation of facts, despite having concerns about the facts stated therein.  His attorney informed him that everyone involved in the case was aware of the extent of his participation in the conspiracy and, that if they changed the wording, the judge would not accept the plea agreement.

While living in the United States, Arguelles worked as a pest control technician.  He later started a small business exporting small electronics to Venezuela, which was his full time job at the time of the conspiracy.

In the 1980's the United States sold F-16 airplanes to Venezuela.  From 1991 to 1996 Arguelles attended the Air Force Academy.  Arguelles had known Pichardo since the military academy.

According to Arguelles, Lezama, also a retired Venezuelan Air Force officer who Arguelles knew before entering the academy, contacted Arguelles in

9

September 2009. Lezama wanted to purchase F-16 parts. Arguelles admitted that he contacted Pichardo to put Lezama in touch with Pichardo. Arguelles claimed that he was not a party to the transaction and was not supposed to receive anything and that he attended the subsequent meetings because Lezama needed a ride.

Arguelles also discussed the nature of the 2002 protest in Venezuela, which was peaceful. Arguelles and others in the armed forces protested the Chavez government. Three demonstrators were executed. Others were imprisoned. The rest fled the country. Arguelles testified that at least one imprisoned person was tortured. Arguelles was not arrested, beaten, or imprisoned during or after the protest.

Almost two years after the protest (February 2004), Arguelles received a subpoena from the prosecutor in Venezuela. Arguelles believed that if he appeared he would be immediately imprisoned, tortured, and maybe killed. Arguelles testified that his 2002 protest and 2004 arrest warrant would still be relevant today, despite Chavez's death. The current President, Maduro, who took power in 2013, was mentored by Chavez, served as Chavez's vice president, and was Chavez's hand-picked successor.

Arguelles claimed that after his criminal case in the United States, President Chavez spoke on national television in Venezuela about him and called him a traitor and the state-sponsored television showed his picture and did the same

10

thing.  Arguelles has never had any contact with any official of Maduro's government.[3]

## B.    Dr. Bagley

Arguelles also presented the expert testimony of Dr. Bruce Bagley, who has a Ph.D. in Political Science and is the Chair of the Department of International Studies as the University of Miami.  Dr. Bagley described the Venezuelan government as "increasingly authoritarian."  Dr. Bagley agreed with the State Department's 2013 Venezuela Human Rights Report that Venezuela's judicial system is politicized and used by the government as a means of political persecution.  In Venezuela's prisons, cruel and unjust punishment is "the theme of the day."  Dr. Bagley opined that "being thrown into that [prison] system really is life threatening, particularly for people who are known to be opponents of the government."  Dr. Bagley also opined that because Arguelles received a 2004 subpoena from a civilian authority, rather than a military tribunal, he "was going to be railroaded" and "set up."  Dr. Bagley testified that if Arguelles had appeared for his 2004 subpoena, Arguelles "would have been subjected to very harsh and cruel conditions" and "potentially his life would have been placed in danger."

---

[3]Arguelles's wife testified that she was an attorney in Venezuela, helped the military members of the Altamira Square protests, and was identified as part of the opposition.  She believed that, if Arguelles were deported to Venezuela, he would be killed.

Dr. Bagley explained that "[a]nybody who is connected with dissent, even legal constitutional democratic dissent, is an object of suspicion, particularly by this successor to Chavez" because the "levels of paranoia, the levels of suspicion within the Venezuelan government with regard to the military are extremely high." "Under these circumstances," Dr. Bagley believed that if Arguelles returned to Venezuela, as a person "associated with dissident movements within the Venezuelan military, especially the suspect air force," Arguelles "would be subjected . . . to harsh and abusive treatment, probably torture."  Dr. Bagley continued to say that the Venezuelan government "could easily end his life because they are seeking to send a message to everybody in the Venezuelan military, retired, or[] currently active, that it is not acceptable to express any form of dissent with regard to the government . . . under current circumstances."

Dr. Bagley explained that Arguelles would be placed in a similar position to that of Captain Nieto,[4] a military dissident who was tortured.  Venezuela's security services would remember Arguelles because they have long memories, keep extensive files, are intently focused on military dissidents, and still have a subpoena out for him.

---

[4]Arguelles submitted a newspaper article that explains that Captain Juan Carlos Nieto was alleged to be part of a plot against the Venezuelan government in 2014 and when Nieto returned from a visit to the United States he was arrested and "savagely tortured by military intelligence."

12

### C.    Two Venezuelan Refugees

Arguelles also called two Venezuelan refugees who are now American citizens. Pedro Pereira was a general in the Venezuelan Air Force and entered the United States in 2008 as a refugee. Pedro Flores was a captain in the national guard in Venezuela. Both participated in the Altamira Square protests in 2002, and Flores knew Arguelles there. Both received a subpoena from the prosecutor back then and did not appear. According to Flores, if Arguelles were to return to Venezuela, he would be incarcerated and then word from people who work with the government would be sent out to have him killed as happened with a Colonel Deolindo Cordero.[5]

## III.    IJ DECISION

On February 11, 2015, the IJ issued a 78-page written decision, denying Arguelles's applications for relief and ordering him removed to Venezuela. Having previously found that Arguelles was removable by engaging in activity to violate American exports laws, the IJ determined whether Arguelles was eligible for the relief of adjustment of status, waiver, asylum, withholding of removal, or CAT protection.

---

[5]The judgment in Arguelles's criminal case and the conviction documents are in the record. The IJ also admitted into evidence various exhibits submitted by Arguelles.

## A.    Ineligible for Adjustment of Status

As to the application for adjustment of status, the IJ found that Arguelles was inadmissible.

The IJ concluded that Arguelles had "been convicted of an act which constitutes the essential elements of a crime involving moral turpitude," rendering him inadmissible under 8 U.S.C. § 1182(a)(2)(A)(i)(I).  The IJ applied the categorical approach to Arguelles's conviction and reasoned that "exporting or importing defense articles on the United States Munitions list without obtaining the required license or approval is conduct that endangers others by its very nature without requiring that a person act with the intent to harm a specific person."  The IJ concluded that Arguelles's conviction constituted the essential elements of a crime involving moral turpitude.

The IJ also found that Arguelles returned from a trip abroad on October 26, 2009 during the time of the conspiracy and, at that time, entered the United States with the purpose of engaging in activity violating laws prohibiting the export of goods, technology, or sensitive information.  The IJ concluded that Arguelles was also inadmissible pursuant to 8 U.S.C. § 1182(a)(3)(A)(i)(II), which renders inadmissible any alien who enters the United States to engage in any activity to violate U.S. export laws.  8 U.S.C. § 1182(a)(3)(A)(i)(II).

14

## B.    Waiver of Inadmissibility

The IJ also concluded Arguelles did not warrant a waiver of inadmissibility. The IJ denied Arguelles's waiver of inadmissibility because a waiver, pursuant to INA § 212(h), 8 U.S.C. § 1182(h), is not available for a ground of inadmissibility under INA § 212(a)(3)(A)(i), 8 U.S.C. § 1182(a)(3)(A)(i).[6] Even if he were eligible, the IJ further concluded that, while Arguelles's family has faced hardship during his incarceration, including financial difficulty, their situation did not rise to the level of extreme hardship that would support a waiver.

## C.    Exercise of Discretion

As an alternative, independent reason, the IJ found that Arguelles's application for adjustment of status did not warrant a favorable exercise of discretion because the seriousness of his criminal offense and his reluctance to admit any significant role in the meetings outweighed the other positive factors in his favor.  The IJ focused on the seriousness of the conviction, including the fact that Arguelles contacted Pichardo, on Lezama's behalf, because Arguelles believed Pichardo could help Lezama obtain airplane parts.

The IJ also considered positive factors in Arguelles's favor.  Arguelles has a wife, children, and other family members who are American citizens.  Arguelles

---

[6]The IJ found that Arguelles was not convicted of a violent or dangerous crime.

15

had a good relationship with his family. Arguelles was employed and operated two businesses.

The IJ, however, concluded that the seriousness of Arguelles's offense could only be overcome by "unusual or outstanding equities," which Arguelles had not shown. The IJ found Arguelles's reluctance to admit the extent of his participation "troubling." Arguelles did not leave the meeting or contact the authorities after hearing the words "black market" for F-16 parts. Arguelles admitted he knew the F-16 parts could not be sent from the United States to Venezuela. Arguelles was a critical member of the conspiracy because he knew how to contact Pichardo, knew Pichardo could help, and connected Lezama with Pichardo.

The IJ determined that the items at issue, even if they were not firearms or ammunition, could "render assistance to a military force of another country" and "have the potential to support that country in the infliction of harm, potentially against the United States." The IJ acknowledged the country conditions evidence. Additionally, when Arguelles applied for naturalization in 2010, he checked the box indicating that he had not been involved in criminal activity even though the events supporting his conviction began in 2009.

For the foregoing reasons, the IJ declined, as a matter of discretion, to grant an adjustment of status.

16

**D.     Asylum & Withholding of Removal**

The IJ also found that Arguelles was not eligible for asylum or withholding of removal because he was convicted of a particularly serious crime. The IJ found that (1) Arguelles's conspiring to commit an offense against the United States brought a conviction "within the ambit of a particularly serious crime," and (2) the other pertinent evidence, including the criminal information and the stipulated factual basis, demonstrated that Arguelles was convicted of a particularly serious crime.

**E.     Convention against Torture**

The IJ also determined that Arguelles did not qualify for deferral of removal under CAT because he had not met his burden to show that it was more likely than not that he would be tortured upon his return to Venezuela. Arguelles also had not shown that he was tortured in the past.

The IJ mentioned that a cousin of Arguelles is still in the Venezuelan Air Force and lives in Venezuela, along with other relatives. The IJ pointed out that Dr. Bagley testified that the Venezuelan government is not totalitarian, in the sense that "it does not have the ability to oversee and control everything that occurs within the country."

The IJ recognized that the State Department's 2013 Human Rights Report "depicts a country plagued by serious issues," including "summary killings by

17

police elements, torture and other cruel, inhumane, or degrading treatment," as well as "life-threatening prison conditions, . . . deaths in prison, arbitrary arrests and detentions, corruption and impunity in police forces, political prisoners and corruption at all levels of the government."  Nonetheless, the IJ concluded that simply showing a pattern of human rights violations was insufficient, as the burden was on Arguelles to demonstrate that he personally was at risk of torture, which he failed to do.  The IJ concluded that, in any event, Arguelles had not demonstrated that such torture would be by, or with, the consent or acquiescence of, a public official.

The IJ explained that Arguelles had not shown that he himself more than likely would be subjected to torture if returned to Venezuela in 2015.  The IJ discussed the 2013 Human Rights Report but found that there was evidence that the Venezuelan government was "taking steps to combat any such abuses" and there was "some indication" that the government was working to improve the prison system.  The IJ recognized that in 2014 there was "a rash of protests" leading to violence in the streets, the deaths of protestors and security forces, and arrests of protestors, including opposition leader Leopoldo Lopez.  The IJ found that those 2014 protests were "largely led by students" and Arguelles was not involved.

18

According to the IJ, Arguelles's "primary fear . . . is that he will be imprisoned . . . and that, in prison, he will be subjected to torture." The IJ concluded that Arguelles had "not demonstrated that there are specific grounds that exist that indicate he would be personally at risk for torture were he to be imprisoned." The IJ found that Dr. Bagley did not testify that participants in the 2002 protests "are specifically sought out for torture or are subjected to harm greater than what any prisoner in Venezuela experiences."

The IJ found that there was "no indication in the record that a participant in the 2002 protests in the Plaza of Altamira who returns to Venezuela 13 years after the protests, will more likely than not be tortured." The IJ also noted that Arguelles remained in Venezuela until 2004 and does not claim to have been harmed while in Venezuela from 2002 to 2004.

The IJ distinguished the example of opposition leader Leopoldo Lopez because Lopez participated, not just in the 2002 Altamira protests, but also in a 2002 military coup and the 2014 student protests. We note that, similarly, Captain Nieto, to whom Dr. Bagley compared Arguelles, was involved in a 2014 plot against the Venezuelan government. The IJ also distinguished a report of an army member who participated in the 2002 protests and "was detained and supposedly electrocuted" because that incident occurred while Chavez was president, while Maduro is now president.

19

The IJ found that Arguelles's "fear of returning to Venezuela appears to be genuine" but that he participated in a conspiracy to export items on the Munitions List to Venezuela's armed forces. The IJ concluded that "there is no indication in the record that participants in the 2002 protest are currently being targeted by the judicial system based upon their participation in that 2002 protest and subjected to torture as a result of such prosecution."

Arguelles appealed through counsel to the BIA.

## IV.    PROCEEDINGS BEFORE THE BIA

### A.    Initial Appeal

On July 23, 2015, the BIA dismissed Arguelles's appeal. As to removability, the BIA decided that the IJ "properly found that" Arguelles was removable under 8 U.S.C. § 1227(a)(4)(A)(i). The BIA reasoned that Arguelles pleaded guilty to conspiracy to violate the AECA and that any "activity to violate any law" included a conspiracy.

As to Arguelles's application for relief from removal, the BIA found find it unnecessary to decide (1) whether Arguelles's crime is one of moral turpitude; (2) whether Arguelles is inadmissible; or (3) whether extreme hardship existed in relation to his waiver of inadmissibility. Instead, the BIA agreed with the IJ's exercise of discretion analysis.

In that regard, the BIA agreed with the government and the IJ that the negative equity of Arguelles's conviction, in which he attempted to provide items that "render assistance to a foreign military" and "have the potential to support that country in the inflict of harm, including against the United States," outweighed Arguelles's positive equities, which included his family ties, history of gainful employment, financial and emotional support to his family, and the worrisome conditions in Venezuela. The BIA agreed that Arguelles was convicted of a particularly serious crime that rendered him ineligible for asylum and withholding of removal, as the evidence indicated that (1) he "knowingly and willfully conspired to export" defense articles on the Munitions List without State Department approval; (2) he met with several individuals to discuss the sale of aircraft parts requested by the Venezuelan Air Force, knowing that the airplane parts could not be sent legally from the United States to Venezuela; and (3) his conduct "was harmful to the security and foreign policy interests of the United States."

As to CAT relief, the BIA agreed with the IJ's finding that the record evidence was insufficient to demonstrate that Arguelles himself more likely than not will be tortured by government officials upon his return. Notably, the BIA found that there was insufficient evidence to show that torture is used in Venezuelan prisons as a matter of policy or is widespread and pervasive, and

21

Arguelles had not established that a participant in the 2002 protests who returns thirteen years later will more likely than not be tortured.

The BIA agreed with the IJ that Arguelles's "evidence indicates isolated incidents of torture and does not demonstrate that the respondent would be individually singled out." The BIA concluded that Arguelles "did not establish that it is more likely than not that he would be tortured at the instigation of, or with the consent or acquiescence of, the Venezuelan government." The BIA agreed that any claim that government officials would harm Arguelles upon his return was speculative and not supported by the record.

**B.    Motion to Reopen**

On October 21, 2015, Arguelles filed a timely Motion to Reopen with the BIA. Arguelles claimed that on October 19, 2015, his family discovered politically-motivated criminal charges against him in Venezuela from 2009. They obtained Arguelles's entire record, which included a 2009 arrest warrant of which they previously were unaware.

The 2009 arrest warrant listed the "Type of Crime" as "No Crime Indicated." The 2004 arrest warranted listed the crime as "Treachery Conspiracy Against Allied Nation." A government official told Arguelles's family that Arguelles would be detained immediately upon landing in Venezuela. Arguelles contended that his newly discovered arrest warrant significantly strengthened his

22

claim for CAT protection because it supplements the other evidence in the record that he will more likely than not be tortured.

## C.    BIA's Denial of the Motion to Reopen

On December 7, 2015, the BIA denied Arguelles's Motion to Reopen. First, the BIA found that the motion did not provide an adequate explanation for why Arguelles's family did not obtain the 2009 warrant earlier. Second, the BIA concluded that the new arrest warrant with "no crime indicated" was limited evidence that was unlikely to change the result of the case with respect to his application for CAT protection.

## D.    Arguelles's Removal

After the BIA ruled on December 7, the Attorney General had Arguelles removed to Venezuela on December 22, 2015. Upon his arrival, Venezuelan officers arrested Arguelles, and he remains in prison.

## V.    STANDARD OF REVIEW

As a threshold matter, we note that we lack jurisdiction to review the discretionary decision to deny Arguelles's application for adjustment of status. See 8 U.S.C. § 1252(a)(2)(B)(i). However, we retain jurisdiction to review colorable constitutional claims and questions of law, such as statutory eligibility for discretionary relief. See 8 U.S.C. § 1252(a)(2)(D); Alvarado v. U.S. Att'y Gen., 610 F.3d 1311, 1314 (11th Cir. 2010).

Generally, we review only the BIA's decision, except to the extent the BIA adopted the IJ's opinion.  Kazemzadeh v. U.S. Att'y Gen., 577 F.3d 1341, 1350 (11th Cir. 2009).  We review findings of fact, including findings of removability, for substantial evidence.  Adefemi v. Ashcroft, 386 F.3d 1022, 1026-27 (11th Cir. 2004).  We review legal issues de novo.  Zheng v. U.S. Att'y Gen., 451 F.3d 1287, 1289 (11th Cir. 2006).

## VI.    REMOVABILITY

Section § 1227 provides, in relevant part: "Any alien who has engaged . . . in . . . any activity to evade any law prohibiting the export from the United States of goods, technology, or sensitive information . . . is deportable."  8 U.S.C. § 1227(a)(4)(A).  The Court agrees with the Attorney General that § 1227(a)(4)(A) does not require a criminal conviction for an individual to be deportable.  Instead, the person merely needs to have "engaged" in "any activity" that violates "any law prohibiting the export . . . of goods."[7]

The stipulation of facts accompanying Arguelles's guilty plea and Arguelles's own testimony establish the fact that Arguelles engaged in such activity.  Arguelles admitted that he participated in a conspiracy to violate the

---

[7]Arguelles argues that this Court must apply the categorical approach to determine whether his conviction qualifies under § 1227(a)(4)(A).  As noted above, a conviction is not a required element of removal under that section.  The issue here is whether Arguelles committed the prohibited actions, not whether he was convicted of them.  Even though Arguelles's testimony attempted to mitigate his actions, there was still enough evidence for the IJ and BIA to find him removable under § 1227(a)(4)(A).

AECA, which is a law prohibiting the export of goods without a license. Arguelles also admitted that he conspired to procure and supply to the Venezuelan Air Force defense articles designated on the Munitions List without a license or approval to make those sales. He connected Lezama to Pichardo. He attended three meetings with these men and Klokke. "Black market" items were discussed. And, Arguelles knew the items they discussed could not be exported from the United States without the proper licensing. The IJ and BIA thus did not err in concluding that Arguelles was removable under § 1227(a)(4)(A).

## VII. ADJUSTMENT OF STATUS AND THE EXERCISE OF DISCRETION

The status of an alien may be adjusted, at the "discretion" of the Attorney General, to that of a legal permanent resident "if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible[8] to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed." 8 U.S.C. § 1255(a) (footnote added). Even if the three prerequisites are met, the Attorney General has discretionary authority to deny adjustment of status. Usmani v. U.S. Att'y Gen., 483 F.3d 1147, 1150-51 (11th Cir. 2007).

---

[8]Section 1182 provides that "any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of . . . a crime involving moral turpitude (other than a purely political offense) or an attempt or conspiracy to commit such a crime . . . is inadmissible." 8 U.S.C. § 1182(a)(2)(A). The IJ concluded that Arguelles's conviction was for a crime of moral turpitude, but the BIA did not address the issue as it relied on a negative exercise of discretion finding.

25

"[A]pplications for adjustment must of necessity be resolved on an individual basis." In re Arai, 13 I. & N. Dec. 494, 495–96 (B.I.A. 1970). An alien seeking adjustment of status "has the burden of establishing that the requested relief should be granted in the exercise of discretion." In re Blas, 15 I. & N. Dec. 626, 629 (B.I.A. 1974). As noted above, the Court does not have jurisdiction to review the discretionary decision but can review questions of law. Alvarado, 610 F.3d at 1314. Here, we cannot say that Arguelles has shown that the BIA committed any legal error in denying his request for discretionary relief. The BIA properly reviewed the IJ's weighing of the favorable and adverse factors and concluded the IJ properly denied Arguelles's application for adjustment of status. See In re Arai, 13 I. & N. Dec. at 496 (indicating that it is necessary to weigh the adverse factors against the favorable ones). Arguelles has not demonstrated any legal or constitutional error as to that denial.[9]

---

[9]We must reject Arguelles's claim that the BIA violated his due process rights in its exercise of discretion with respect to his application for adjustment of status. "[T]he Fifth Amendment entitles aliens to due process of law in deportation proceedings." Reno v. Flores, 507 U.S. 292, 306, 113 S. Ct. 1439, 1449 (1993). Accordingly, aliens must receive "notice and opportunity to be heard in their removal proceedings." Fernandez–Bernal v. Att'y Gen. of the U.S., 257 F.3d 1304, 1310 n.8 (11th Cir. 2001). Arguelles, however, "cannot prevail on his due process claim because he has no constitutionally protected interest in purely discretionary forms of relief." Scheerer v. U.S. Att'y Gen., 513 F.3d 1244, 1253 (11th Cir. 2008). "Adjustment of an alien's status . . . is a discretionary form of relief." Id. Arguelles thus has no constitutionally protected interest in his adjustment of status.

## VIII.  ASYLUM AND WITHHOLDING OF REMOVAL

An alien is ineligible for asylum under 8 U.S.C. § 1158, if "the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States."  8 U.S.C. § 1158(b)(2)(A)(ii). Section 1158 also provides that an aggravated felony shall be considered a particularly serious crime but permits the Attorney General to "designate by regulation offenses that will be considered to be a" particularly serious crime.  8 U.S.C. § 1158(b)(2)(B)(i)-(ii).

Similarly, an alien, who otherwise would not be removed because the alien's life or freedom would be threatened because of the alien's political opinion, is ineligible for such withholding if "the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States."  8 U.S.C. § 1231(b)(3)(B)(ii).  Section 1231 further provides:

> For purposes of clause (ii), an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime.

8 U.S.C. § 1231(b)(3)(B).

Arguelles contends that, based on a comparison of § 1158 and § 1231, for a conviction to constitute a particularly serious crime to bar an applicant for

27

withholding of removal under § 1231, the conviction must be for an aggravated felony.

This Court has read § 1231(b)(3)(B) to give the Attorney General discretion to determine the existence of a particularly serious crime except when the conviction is for an aggravated felony with a sentence of imprisonment of five years or more.  Cole v. U.S. Att'y Gen., 712 F.3d 517, 530 (11th Cir. 2013) ("Simply stated, this subsection gives the Attorney General discretion to deny withholding of removal to otherwise qualified aliens if they have committed what the Attorney General deems to be a particularly serious crime. When, however, an alien has committed an aggravated felony or felonies, and the aggregate term of imprisonment is five years or more, the Attorney General has no discretion, and the statute automatically bars the alien from withholding of removal.").

The BIA also interprets § 1231(b)(3)(B) as giving the Attorney General discretion, allowing "that a particularly serious crime need not be an aggravated felony."  In re N-A-M-, 24 I. & N. Dec. 336, 337 (B.I.A. 2007).  This Court has cited In re N-A-M with approval in a case where the IJ determined whether a non-aggravated felony constituted a particularly serious crime.  See Lapaix v. U.S. Att'y Gen., 605 F.3d 1138, 1143 (11th Cir. 2010) ("When the offense in question is not a per se particularly serious crime, the Attorney General retains discretion to

determine on a case-by-case basis whether the offense constituted a particularly serious crime. (citing In re N-A-M, 24 I. & N. Dec. at 338)).

Given Lapaix, Cole, and In re N-A-M, we must conclude that the BIA did not err in concluding that Arguelles's crime could be a particularly serious crime without being an aggravated felony.

Alternatively, Arguelles argues that the BIA erred in concluding his crime actually was a particularly serious crime. We disagree because the BIA fully considered the facts, circumstances, and nature of Arguelles's conviction. First, the BIA expressly addressed the nature of Arguelles's conviction, a conspiracy, and noted that § 1182(a)(3)(A)(i)'s "any activity to violate any law" language includes a conspiracy. Second, the BIA considered Arguelles's testimony concerning the extent of his involvement with the conspiracy and his culpability. The BIA, however, agreed with the IJ that it was "troubling" that Arguelles "was reluctant to admit" the extent of his participation. The BIA also noted that Arguelles did not leave the meetings or attempt to alert the authorities. Third, the IJ and the BIA looked at the particular facts and noted that Arguelles admitted that he knew the items could not be exported legally from the United States. The IJ was free to rely on the stipulated facts to which Arguelles and his attorney agreed.

The IJ and the BIA also properly took into account the elements of Arguelles's office, including the fact that the items Arguelles admitted to

29

conspiring to sell were listed on the Munitions List. The BIA, and the IJ, reasonably concluded that the attempted sale of items on that list, even airplane parts and engines, was a particularly serious crime.

To affirm the BIA's decision, this Court need not decide whether the BIA and IJ made the best possible decision. Indeed, the Court need not even agree with their decisions, as long as those decisions were reasonable. The Court concludes that they were. The evidence in the record, while often favorable to Arguelles, does not compel a reversal of the IJ's fact findings in this regard.

## IX.    CAT RELIEF

Arguelles contends that the BIA erred in denying him deferral of removal under CAT. "The burden of proof is on the applicant for withholding of removal under [CAT] to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). The BIA found, as did the IJ, that Arguelles had not demonstrated that it was more likely than not that he personally would be singled out for torture upon his return.[10]

This Court reviews the IJ's factual determinations using the substantial evidence test. Carrizo v. U.S. Att'y Gen., 652 F.3d 1326, 1330 (11th Cir. 2011). "To reverse the BIA's fact findings, this Court must find that the record not only

---

[10]The government has argued that Arguelles's CAT claims, among others, are moot because of his removal to Venezuela. The government has now withdrawn its mootness argument and focuses its argument on the merits of the CAT claim.

30

supports reversal, but compels it." Rodriguez Morales v. U.S. Att'y Gen., 488 F.3d 884, 890 (11th Cir. 2007) (alterations and quotation marks omitted).

The evidence in the record is insufficient to compel this Court to find that it is more likely than not that the Venezuelan government would torture Arguelles after his return to Venezuela. Arguelles argued before the BIA, as well as on appeal now, that, because of the conditions of Venezuela's prisons, the prisons themselves are a "calculated tool of torture in Venezuela" and thus when a person is targeted and placed in prison, in violation of their constitutional rights, they have been singled out for torture. Upon his removal to Venezuela, Arguelles was arrested and imprisoned.

The country condition evidence shows that Venezuela suffers from significant human rights violations, including political violence and harsh and life-threatening prison conditions. That pattern of behavior, however, does not, by itself, suffice to show that Arguelles in particular would likely be tortured in prison. The Human Rights Report indicates that some incidences of torture have occurred in Venezuelan prisons, but Arguelles must demonstrate beyond those general conditions that he will individually be singled out for torture. See Jean-Pierre v. U.S. Att'y Gen., 500 F.3d 1315, 1324 (11th Cir. 2007) (holding that the petitioner must "establish that they would be individually and intentionally singled out for harsh treatment").

31

Arguelles pointed to evidence that he claims shows people similarly situated to him were tortured. The IJ considered this evidence and determined that those people were not similarly situated to Arguelles. The record does not compel a contrary conclusion. Captain Nieto and the three Venezuelan Air Force generals arrested in 2014, for instance, were accused of being involved in coup attempts. Arguelles has not been accused of being involved in a coup and instead was involved in peaceful protests in 2002. Arguelles also points to the example of Leopoldo Lopez. Lopez was arrested for his involvement in the 2002 Altamira protests but was released and then arrested again in 2014 for participation in protests in 2014 and not for his actions twelve years prior.

Arguelles also stresses that other people involved in the 2002 protests were tortured following those protects. Those actions, however, occurred over a decade ago and closer to the time of the protests. Furthermore, Arguelles lived in Venezuela without suffering harm for two years after the protests.

The IJ also considered Dr. Bagley's testimony that the Venezuelan government resorts to torture and that torture occurs in Venezuelan prisons. But Dr. Bagley's testimony is general in nature and does not compel the conclusion that Arguelles would more likely than not be singled out for torture.

While Arguelles's evidence shows serious and troubling conditions in Venezuela, including some instances of torture, his evidence does not compel the

conclusion that Arguelles met his burden to show that, more likely than not, <u>he</u> will be <u>singled out</u> for torture.  See <u>Cadet v. Bulger</u>, 377 F.3d 1173, 1195 (11th Cir. 2004) (noting that the alien had the "burden to show that he more likely than not would be tortured if returned" and had failed to do so).  At worst the evidence suggests that Arguelles will be arrested, detained, and kept in harsh conditions.  <u>See</u> <u>id.</u> ("CAT does not require deferral of removal when a deportee may, or even will more likely than not, be subjected to cruel, degrading or inhuman treatment upon removal.").  Arguelles's evidence also did not show that he will be treated more harshly than any other prisoner in Venezuela or that this harsh treatment rises to the level of torture.  Because there is minimal particularized evidence showing Arguelles would be singled out for torture, this is not the rare case where the record <u>compels</u> this Court to reach a different conclusion than the IJ and BIA.

## X.    OCTOBER 2015 MOTION TO REOPEN

An alien's motion to reopen "shall state the new facts that will be proven at a hearing to be held if the motion is granted, and shall be supported by affidavits or other evidentiary material."  8 U.S.C. § 1229a(c)(7)(B).  "A motion to reopen proceedings shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing."  8 C.F.R. § 1003.2(c)(1).  We review the BIA's denial of a motion to reopen for an abuse of discretion.  <u>Chacku</u>

33

v. U.S. Att'y Gen., 555 F.3d 1281, 1286 (11th Cir. 2008). "This review is limited to determining whether the BIA exercised its discretion in an arbitrary or capricious manner." Zhang v. U.S. Att'y Gen., 572 F.3d 1316, 1319 (11th Cir. 2009).

We cannot say the BIA acted arbitrarily or capriciously in denying Arguelles's Motion to Reopen. The new country condition evidence did not substantially add to the previous country condition evidence. The BIA thus did not abuse its discretion in concluding that the new country condition evidence would have altered the outcome.

While the 2009 arrest warrant was new evidence, that evidence would not satisfy Arguelles's "heavy burden" of demonstrating that it would likely change the outcome of his application for deferral of removal under CAT. At best the 2009 arrest warrant shows that the Chavez government was still interested in Arguelles five years after the 2004 arrest warrant and that they are likely to arrest him upon his arrival in Venezuela, which is exactly what they did. The problem for Arguelles though is that the 2009 arrest warrant does not indicate that the conditions of his confinement amount to torture or that he will otherwise be targeted out for torture. The BIA did not abuse its discretion or err in concluding that this additional arrest warrant, by itself, was insufficient to change the outcome

34

of the case.  For the foregoing reasons, we cannot say that the BIA erred in denying the Motion to Reopen.

## XI.    MOTION TO STRIKE

The government continues to advance its "Motion to Strike Portions of Petitioner's March 28, 2016 Reply Brief and Addendum to the Reply."  The relevant portion is Exhibit D to Arguelles's Reply brief, which is extra-record evidence about events taking place after Arguelles's removal to Venezuela.

Exhibit D contains (1) a Judicial Notice of Incarceration, indicating Arguelles had been subject to "preventative deprivation of liberty" "for committing crimes of Conspiracy" and (2) a letter from Arguelles's Venezuelan attorney discussing the status of his imprisonment.  According to the letter, Arguelles was detained when he landed in Venezuela, and he now sleeps in a small cell in the basement of the Military Contra Intelligence Division in Boleita, Caracas.  There are no windows or natural light.  He does not have a watch or clock.  He cannot speak to his legal team in private, and they can only talk to him through a phone cabin up to an hour per week.  Arguelles is allowed outside only one hour each week and now has a rash.  His allergies and breathing problems are exacerbated by the poor ventilation.  There are neither recreational activities nor potable water. Instead, his family brings water when they visit at which time they are subjected to

35

complete strip searches.  And, Arguelles's "case has been plagued by irregularities since the beginning."

While these conditions of imprisonment are patently harsh, they do not rise to the level of torture which is required for CAT relief.  Accordingly, we deny the government's motion to strike as moot.

## XII.   CONCLUSION

For the foregoing reasons, we must deny Arguelles's petitions for review, affirm the BIA's final order, and affirm the denial of reopening.  We deny the motion to strike as moot.

To be clear, all we say here is that based on the record before us, we are not compelled to conclude that Arguelles's imprisonment rises to the level of torture. Nothing herein should be read as precluding Arguelles from continuing to press his case with the Attorney General.  If Arguelles presents additional evidence at a later date, we note that both the BIA sua sponte, and the Attorney General for that matter, can reopen and reconsider Arguelles's case.  Nothing in this opinion should be read as restricting whatever authority they have.  Finally, we note that the Attorney General conceded at oral argument that if Arguelles somehow won his release from detention in Venezuela and made it to the United States he could seek asylum and apply again for CAT protection.  But such a remedy is quite unlikely to provide any relief to Arguelles any time soon.  Thus, we emphasize again that

nothing in this opinion should be read to foreclose or limit a claim by Arguelles for

asylum, which the Attorney General stated at oral argument has a much lower

standard for relief.

**AFFIRMED.**

MARTIN, Circuit Judge, concurring:

At every stage of his case, Mr. Arguelles told U.S. authorities that if he were returned to Venezuela he would be imprisoned and likely tortured on account of his role in political protests there during 2002. The government repeatedly rejected his claims. Turns out, Mr. Arguelles was right. When he was removed to Venezuela, Mr. Arguelles was met at the airport by Venezuelan authorities who took him directly to prison. In that prison, he is allowed to see the sun only one hour per week and there is no water safe for him to drink. The majority opinion correctly sets out our Circuit precedent as well as the authority given us by statute to review Mr. Arguelles's case. Based on that precedent and our limited authority, the majority properly concludes that we must affirm the government's decisions.

I write separately, however, to detail some of the evidence Mr. Arguelles submitted in his effort to receive protection under the Convention Against Torture ("CAT") and to explain why I view this evidence as sufficient to have warranted CAT protection for Mr. Arguelles. This case also compels me to critique the burden placed on a person seeking CAT protection. Finally, I describe the appalling conditions of confinement in which Mr. Arguelles now finds himself in Venezuela, and how this irreparable harm to Mr. Arguelles could have and should have been avoided.

38

# I.  MR. ARGUELLES'S CLAIM UNDER THE CAT

A.    EVIDENCE FOR THE CAT CLAIM

In his 2014 application for asylum and withholding of removal, Mr. Arguelles wrote that he feared he would be "incarcerated and tortured by [] Maduro's government for [his] outspoken political opposition because [he is] a member of the Air Force and [] participat[ed] in peaceful protest."  In his pretrial statement before the Immigration Judge ("IJ"), Mr. Arguelles explained that after participating in peaceful protests against the Chavez government for more than a year, he "had to remain in semi-hiding" as his "[f]ellow military colleagues were imprisoned" or "went into exile."  He was eventually subpoenaed to be served with formal criminal charges and left Venezuela to avoid arrest.  In 2004, the United States granted him asylum from the Chavez regime.  Also in his pretrial statement seeking to avoid removal, Mr. Arguelles said Venezuela's new government continues to arrest peaceful protestors.  He argued that the Venezuelan government practices torture.  In that regard, he highlighted the torture of a judge in 2009 as well as a 2013 Human Rights Report on Venezuela written by the U.S. Department of State that discussed torture and life-threatening conditions in Venezuelan prisons.

Mr. Arguelles filed four exhibit packages containing dozens of reports and articles on Mr. Arguelles's story, the conditions in Venezuela, and Venezuela's treatment of peaceful protestors.  Included among these exhibits was the 2013 Human Rights Report on Venezuela, which listed human rights problems such as "summary killings by police elements; torture and other cruel, inhumane, or degrading treatment; harsh and life-threatening prison conditions and lack of due process rights that contributed to widespread violence, riots, injuries, and deaths in prisons."  The exhibits also included a 2014 statement by John Kerry, the U.S. Secretary of State, expressing concern over the Venezuelan government's confrontation with peaceful protestors and calling for the release of members of the opposition who had been jailed.  The package contained Mr. Arguelles's arrest warrant from 2004 for the crimes of "Conspiracy, Civil Rebellion, and Instigation of Insurrection."

Also among Mr. Arguelles's exhibits was the affidavit of Dr. Bruce Bagley, an expert, who said Venezuela's current President, Nicolas Maduro, "has continued to jail opposition figures" and "[t]orture occurs routinely in Venezuela's jails and prisons."  Dr. Bagley further explained:

> Anyone who participated in the 2002 [] protest movement is now either in jail or in exile.  President Chavez did not take action immediately against the peaceful [] protesters.  Instead, he initially adopted a rhetorical policy of "reconciliation."  Within a year, however, he began systematically to round up, arrest and jail military personnel who had [] participated . . . in the [] protests.

40

Dr. Bagley testified that torture exists in Venezuela today and President Maduro "has resorted to systematic torture in order to dissuade or repress the opposition." His testimony continued that "people who are returned to Venezuela and who are associated with dissident movements within the Venezuelan military, especially the suspect air force, which . . . was not a close follower of Chavez . . . would be subjected [] to harsh and abusive treatment, probably torture, and they could easily end his life." He also stated that President Maduro was "hand-picked by President Chavez" to continue Chavez's professed "Bolivarian Revolution" and that conditions in Venezuela have worsened during Maduro's presidency.

Mr. Arguelles's wife is an American citizen. With her he has two American-born children. At the time of his hearing before the IJ, his children were ages six and four. In response to how his removal to Venezuela would affect his family, Mr. Arguelles answered he would "be first in prison, then tortured, then killed," and anyone who "has lost a family member knows what it feels [sic]." Mr. Arguelles expressed his belief that his fellow protestors who had been jailed were also tortured. He also said he left Venezuela "following [his] lawyer's advice, that [he] was going to be imprisoned, tortured, and maybe killed." In response to why the Venezuelan government would be aware of him after his long absence, Mr. Arguelles explained that the air force is the biggest threat to the government and the government would punish him to send a message to the armed forces. Mr.

41

Arguelles testified that President Chavez spent almost an hour on a government television station insulting Mr. Arguelles after his arrest in the United States in 2012.

As the majority has recounted, the IJ and BIA rejected Mr. Arguelles's petition. He next filed a motion asking the BIA to reopen his appeal on the ground that if he were returned to Venezuela, he would be immediately detained and more likely than not tortured. Mr. Arguelles presented a newly discovered 2009 arrest warrant listing "no crime indicated" as the explanation for his arrest. In explaining his delay in producing this arrest warrant, Mr. Arguelles submitted an affidavit from his sister detailing that this arrest warrant was not publicly available in Venezuela. Her affidavit also explained the risk of seeking out this warrant from those who don't want it made public. Mr. Arguelles included articles about Venezuela published since his first submission of exhibits to the IJ. Among those articles was the U.S. Department of State's 2014 Human Rights Report for Venezuela, which again noted reports of torture.

## B.     THE IJ AND BIA DENIED CAT PROTECTION

The IJ explained that to receive CAT protection Mr. Arguelles was required to "show that it is more likely than not that he [] will be singled out for torture by a public official acting in his or her official capacity or at the instigation or with the

acquiescence of such an official." The IJ found that Mr. Arguelles had not met his burden under this "more likely than not" standard.

For Mr. Arguelles's case, the IJ found that "a pattern of human rights violations alone is not sufficient" and that Mr. Arguelles had not demonstrated he "will be personally at risk of torture." The IJ discounted Mr. Arguelles's fear of imprisonment and the Human Rights Report's "grim picture of Venezuela's prison system" because, again, the IJ felt Mr. Arguelles failed to show he would be singled out for torture in prison. The IJ treated Dr. Bagley's testimony in much the same way. He discounted Dr. Bagley's testimony that torture routinely occurs in Venezuelan prisons, because Dr. Bagley did not testify specifically that those imprisoned for the 2002 protests were singled out for torture or were "subjected to harm greater than what any prisoner in Venezuela experiences." On this record, the IJ found "[t]here is no evidence that torture is used in Venezuelan prisons as a matter of policy or that the deliberate infliction of torture is widespread and pervasive."

The IJ also distinguished Mr. Arguelles from known Venezuelan torture victims, saying those victims had been targeted for their involvement in coups or their participation in more recent 2014 protests. He even distinguished one torture victim because he had been tortured under the Chavez regime and not the Maduro regime. The IJ concluded:

There is no indication in the record that a participant in the 2002 protests . . . who returns to Venezuela 13 years after the protests, will more likely than not be tortured. [Mr. Arguelles]'s evidence speaks to general violence and political repression in Venezuela, not to specific instances where identified individuals like [Mr. Arguelles] were recently subjected to treatment that constitutes torture.

The BIA, reviewing the same record, agreed with the IJ. The BIA ruled "[t]here is insufficient evidence in the record that torture is used in Venezuelan prisons as a matter of policy or that it is widespread and pervasive." It decided Mr. Arguelles "did not establish that a participant in the 2002 protests, who returned to Venezuela 13 years later, will more likely than not be tortured." Instead, it determined Mr. Arguelles's fears were "speculative." The BIA concluded Mr. Arguelles "did not establish that it is more likely than not that he would be tortured."

The BIA also denied Mr. Arguelles's motion to reopen based on new evidence because it was "not persuaded that this limited evidence of an additional 'no crime indicated' charge has been shown to satisfy the respondent's heavy burden of demonstrating that it would likely change the result in this case."

C.    THE RECORD DOES NOT COMPEL REVERSING THE BIA

Sitting as the IJ or on the BIA, I would have granted Mr. Arguelles's CAT claim. I view Mr. Arguelles's evidence as sufficient to have met his burden under the CAT. To begin, his record had already been the basis for the United States' grant of asylum to Mr. Arguelles in 2004. His evidence at that time included a

44

pending arrest warrant from 2004.  Mr. Arguelles has since also offered expert testimony about the efforts of the Maduro government to closely follow in President Chavez's footsteps, including torture of opponents of the Chavez regime, with a particular wariness for dissidents from the air force.  Mr. Arguelles provided credible reports of torture and life-threatening prison conditions.  He also testified that, as recently as 2012, President Chavez disparaged him on government television.  This evidence suggested the current Venezuelan government intended to punish Mr. Arguelles if it could get its hands on him, and that torture was a regular form of punishment for political prisoners in Venezuela.  Had I been a part of the immigration adjudication process, I would have also granted Mr. Arguelles's motion to reopen.  The evidence I've described, together with the 2009 warrant, issued after Mr. Arguelles had been out of the country for 5 years, confirmed the Venezuelan government's continued interest in imprisoning and punishing Mr. Arguelles, with torture as a likely option.

However, our Circuit precedent gives us a very limited role in reviewing BIA decisions.  See Rodriguez Morales v. U.S. Att'y Gen., 488 F.3d 884, 890 (11th Cir. 2007) (per curiam) ("To reverse the BIA's fact findings, this Court must find that the record not only supports reversal, but compels it." (alterations adopted and quotation omitted)); Najjar v. Ashcroft, 257 F.3d 1262, 1278 (11th Cir. 2001) ("It is axiomatic that immigration courts are better suited than a reviewing court to

make factual determinations regarding an alien's status. Courts of appeal sit as reviewing bodies to engage in highly deferential review of BIA and IJ determinations."). The standard of review set by our Court requires us to decide whether the record from the BIA proceeding compels a finding that it is more likely than not that Mr. Arguelles would be tortured by the Venezuelan government. See Rodriguez Morales, 488 F.3d at 890. And we review a motion to reopen under an even more deferential abuse of discretion standard. Butalova v. U.S. Att'y Gen., 768 F.3d 1179, 1182 (11th Cir. 2014) (per curiam). I cannot say the record "compels" reversing the BIA or holding that the BIA abused its discretion in denying the motion to reopen. This is despite my own belief that Mr. Arguelles demonstrated it was more likely than not that he would be tortured. Through our deferential standard of review, this Court gives the BIA a wide berth. We must therefore rely on the BIA to make the right decisions.[1] I say there was plenty in this record to indicate the wisdom of deciding this case in Mr. Arguelles's favor.

## II.  "MORE LIKELY THAN NOT"

---

[1] The government made many discretionary decisions regarding Mr. Arguelles, each of which could have prevented his current predicament. The BIA exercised its discretion to deny Mr. Arguelles's application for adjustment of status. The government also rendered Mr. Arguelles ineligible for asylum based on its discretionary decision that Mr. Arguelles's crime was "particularly serious." This was despite his comparatively short twenty-three month sentence based on evidence that he set up and attended three meetings about selling airplane parts to Venezuela. The government then exercised its discretion to remove Mr. Arguelles before his appeal was decided. Now, the government continues to exercise its discretion by not reopening Mr. Arguelles's case to consider new evidence.

Mr. Arguelles's case also demonstrates the problems presented by the burden of proof placed on petitioners seeking CAT protection.  In order to have his removal deferred under the CAT, a petitioner must prove to the government that it "is more likely than not" he will be tortured.  8 C.F.R. § 208.17.  But this standard is not found in the CAT.  Instead the CAT forbids a party to the treaty from returning "a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture."[2]  Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3, Dec. 10, 1984, 108 Stat. 382, 1465 U.N.T.S. 85.  The Seventh Circuit recently observed "that the 'more likely than not' standard articulated in many CAT opinions cannot be and is not taken literally."  Gutierrez v. Lynch, 834 F.3d 800, 806 (7th Cir. 2016) (quotation omitted).  Instead, that court articulated the proper inquiry to be:  whether "there is, or is not, a substantial risk that a given alien will be tortured if removed from the United States."  Rodriguez-Molinero v. Lynch, 808 F.3d 1134, 1136 (7th Cir. 2015).  I view the Seventh Circuit's

---

[2] The CAT was implemented by Congress through the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681, 2681–822, ("FARR Act") codified as a note to 8 U.S.C. § 1231:

> It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.

Id.; see Reyes-Sanchez v. U.S. Att'y Gen., 369 F.3d 1239, 1240 n.1 (11th Cir. 2004).

47

formulation of this standard as better reflecting the language of the CAT as well as the FARR Act.

Indeed the "more likely than not" standard does more than stray from the language of the CAT and the FARR Act. It also suggests to IJs and the BIA, wrongly I think, a sense that they can and must predict a petitioner's risk of being tortured once removed. But my experience tells me that courts cannot be expected to meaningfully discern, for example, between a 51% and a 49% likelihood of torture. See Arrazabal v. Lynch, 822 F.3d 961, 966 (7th Cir. 2016) ("[T]hat oft-repeated phrase ['more likely than not'] must be understood pragmatically in the immigration context, because there is no reliable data to show just how great an applicant's risk of torture is."). This "more likely than not" standard has resulted in IJs demanding an impossible level of proof on torture claims. For example for Mr. Arguelles, both the IJ[3] and the BIA[4] required him to show that someone identical to him—a wanted political refugee returning to Venezuela more than thirteen years after he partook in peaceful protests—would more likely than not be tortured. I am not aware of any other court that mandates this level of proof from its litigants. Mr. Arguelles's exact circumstance has almost certainly never been duplicated, but there is nothing in the CAT that excludes him from getting relief

_____

[3] "There is no indication in the record that a participant in the 2002 protests . . . who returns to Venezuela 13 years after the protests, will more likely than not be tortured."

[4] Mr. Arguelles "did not establish that a participant in the 2002 protests, who returned to Venezuela 13 years later, will more likely than not be tortured."

48

for that reason.  There is a false sense emanating from the government's standard that the future can only hold precise replications of the past.  Sadly, this led the IJ and BIA to ignore the obvious and substantial risk that Mr. Arguelles would be tortured once he was removed to Venezuela.  Said another way, this led them to get Mr. Arguelles's case tragically wrong.

## III.  THE GOVERNMENT MADE NO EFFORT TO PREVENT IRREPARABLE HARM TO MR. ARGUELLES

As is its right, the government removed Mr. Arguelles while his appeal was pending.  A different panel of this Court denied Mr. Arguelles's emergency motion to stay removal and motion for reconsideration.  He was removed to Venezuela immediately.  Two Department of Homeland Security officials accompanied Mr. Arguelles to Venezuela right before Christmas and handed him over to Venezuelan officials at the airport.  Mr. Arguelles provided us with an affidavit from his lawyers in Venezuela explaining what has happened to him since.  The government of Venezuela is prosecuting Mr. Arguelles for conspiracy, civil rebellion, and incitement to insurrection.  He is imprisoned in a small basement cell with no natural light and permitted outside for just one hour per week.  He is not allowed to have anything with him, including a watch or clock (so as to know the time of day), nor books, TV, or a radio to pass the time.  Mr. Arguelles is only permitted access to his lawyers by phone, and then for only up to one hour per week.  There is no potable water.  Instead his parents, who are almost eighty years old, must

49

endure a humiliating body search that includes stripping naked, jumping, and bending over just to bring him water.  We do not know what will happen to Mr. Arguelles when they can no longer visit.

We are barred by statute from considering this new evidence in reviewing the BIA decision.  8 U.S.C. § 1252(b)(4)(A); see Najjar, 257 F.3d at 1278.  Neither can we remand this case to the BIA to hear new evidence.  8 U.S.C. § 1252(a)(1).  Also, Mr. Arguelles cannot file a motion to reopen now that he has been removed.  8 C.F.R. § 1003.2(d).[5]

On the other hand, the BIA has the authority to reopen or reconsider any of its decisions on its own motion.  8 C.F.R. § 1003.2(a).  Instead of considering this new evidence, the government told us repeatedly during oral argument that if Mr. Arguelles could now just somehow arrive at the United States border he could again apply for CAT protection.  Given the government's role in Mr. Arguelles's current confinement, its straight-faced suggestion that he is welcome to stroll up to United States' border and again ask for help was not well received.

The government does rightly acknowledge that there is nothing anyone here could do for Mr. Arguelles while he is detained in Venezuela even if he were to now win his appeal.  Yet, when responding to Mr. Arguelles's motions to stay removal in this Court, the government chose not to engage with his claims of

---

[5] There are also other reasons Mr. Arguelles cannot file another motion to reopen but it is not important to detail them here.  See, e.g., 8 C.F.R. § 1003.2(c)(2).

irreparable harm, despite recognizing irreparable harm as a "most critical" factor in the stay analysis. See Nken v. Holder, 556 U.S. 418, 434, 129 S. Ct. 1749, 1761 (2009). It is true that in Nken, the Supreme Court told us removal from the United States is not categorically irreparable because removed petitioners "who prevail can be afforded effective relief by facilitation of their return." Id. at 435, 129 S. Ct. at 1761. But I say it is implicit in this rule that removal does constitute irreparable harm when facilitation of a removed petitioner's return will not be possible. Courts must, by their nature, rely on the expertise and discretion of the executive branch of government, and trust it to evaluate whether facilitation of return will be possible after removal. Here, the government flew Mr. Arguelles to Venezuela and affirmatively handed him over to Venezuelan authorities before this Court could hear his appeal. Nothing in the record before us indicates any effort was made to ensure that immigration authorities would be able to facilitate Mr. Arguelles's return if he were to win his appeal.

Considered one-by-one, each decision the government made about Mr. Arguelles is defensible. Yet the sum of these decisions resulted in what I view as our country's failure to live up to its duties under the CAT. My hope is that Mr. Arguelles's case can help us avoid this type of failure in the future. My regret is that he finds himself in the position of having to teach us this lesson.

51